# Exhibit E

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2018**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

**Commission File Number: 001-36357**

# LIPOCINE INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **99-0370688** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(IRS Employer Identification No.)** |
| **675 Arapeen Drive, Suite 202, Salt Lake City, Utah** | **84108** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**801-994-7383**
**(Registrant's telephone number, including area code)**
**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class** | **Name of Exchange on Which Registered** |
|---|---|
| **Common Stock, par value $0.0001 per share** | **The NASDAQ Stock Market LLC** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities Exchange Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes: ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§220.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act (Check one):

| | |
|---|---|
| Large accelerated filer | ☐ |
| Accelerated filer | ☐ |
| Non-accelerated filer | ☒ |
| Smaller reporting company | ☒ |
| Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

**Outstanding Shares**

The aggregate market value of the common stock held by non-affiliates of the Registrant was $26.0 million as of June 30, 2018. For purposes of calculating the aggregate market value of shares of our common stock held by non-affiliates as set forth on the cover page of this Annual Report on Form 10-K, we have assumed that all outstanding shares are held by non-affiliates, except for shares held by each of our executive officers, directors and 10% or greater stockholders. However, this assumption should not be deemed to constitute an admission that all executive officers, directors and 10% or greater stockholders are, in fact, affiliates of our company, or that there are not other persons who may be deemed to be affiliates of our company. Further information concerning shareholdings of our officers, directors and principal stockholders is included or incorporated by reference in Part III, Item 12 of this Annual Report on Form 10-K.

As of March 4, 2019, the registrant had 23,878,948 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive Proxy Statement for its 2018 Annual Meeting of Stockholders are incorporated by reference into Part III of this Form 10-K.

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 19 |
| Item 1B. | Unresolved Staff Comments | 48 |
| Item 2. | Properties | 48 |
| Item 3 | Legal Proceedings | 48 |
| Item 4 | Mine Safety Disclosures | 49 |
| **PART II** | | |
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 49 |
| Item 6. | Selected Financial Data | 50 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 66 |
| Item 8. | Financial Statements and Supplementary Data | 67 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 94 |
| Item 9A. | Controls and Procedures | 94 |
| Item 9B. | Other Information | 94 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 95 |
| Item 11. | Executive Compensation | 95 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 95 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 95 |
| Item 14. | Principal Accountant Fees and Services | 95 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 95 |
| Item 16. | 10-K Summary | 98 |

2

***TLANDO: An Oral Product Candidate for Testosterone Replacement Therapy***

Our most advanced product, TLANDO, is an oral formulation of the chemical, TU, which is an eleven carbon side chain attached to T. TU is an ester prodrug of T. An ester is chemically formed by bonding an acid and an alcohol. Upon the cleavage, or breaking, of the ester bond, T is formed. TU has been approved for use outside the United States for many years for delivery via intra-muscular injection and in oral dosage form and recently TU has received regulatory approval in the United States for delivery via intra-muscular injection. We are using our proprietary technology to facilitate steady gastrointestinal solubilization and absorption of TU. Proof of concept was initially established in 2006, and subsequently TLANDO was licensed in 2009 to Solvay Pharmaceuticals, Inc. which was then acquired by Abbott Products, Inc. ("Abbott"). Following a portfolio review associated with the spin-off of AbbVie by Abbott in 2011, the rights to TLANDO were reacquired by us. All obligations under the prior license agreement have been completed except that Lipocine will owe Abbott a perpetual 1% royalty on net sales. Such royalties are limited to $1 million in the first two calendar years following product launch, after which period there is not a cap on royalties and no maximum aggregate amount. If generic versions of any such product are introduced, then royalties are reduced by 50%.

*NDA Resubmission*

On June 28, 2016, we received a CRL from the FDA on our original NDA submission. A CRL is a communication from the FDA that informs companies that an application cannot be approved in its present form. The CRL identified a deficiency related to the dosing algorithm for the label. Specifically, the proposed titration scheme for clinical practice was significantly different from the titration scheme used in the Phase 3 trial leading to discordance in titration decisions between the Phase 3 trial and real-world clinical practice. In response to the CRL, we met with the FDA in a Post Action meeting and proposed a dosing regimen to the FDA based on analyses of existing data. The FDA noted that while the proposed dosing regimen might be acceptable, validation in a clinical trial would be needed prior to resubmission. The DV study was in response to the FDA's request. We also initiated the Dosing Flexibility ("DF") study to assess TLANDO in hypogonadal males on a fixed daily dose of 450 mg divided into three equal doses.

We resubmitted our NDA to the FDA in August 2017 based on the results of the DV study. As described more fully below, the DV study confirmed the efficacy of TLANDO with a fixed dose regimen without need for dose adjustment. TLANDO was well tolerated upon 52-week exposure with no reports of drug related Serious Adverse Events ("SAEs"). On May 8, 2018 TLANDO received a CRL from the FDA regarding our NDA. The CRL identified four deficiencies which include the following: determining the extent, if any, of ex vivo conversion of TU to T in serum blood collection tubes to confirm the reliability of T data; obtaining definitive evidence pre-approval via an ABPM study as to whether TLANDO causes a clinically meaningful increase in blood pressure in hypogonadal men, which is a surrogate marker of predicting cardiovascular outcomes; verifying the reliability of Cmax data and providing justification for non-applicability of the agreed-upon and prespecified Cmax secondary endpoints for TLANDO; and, determining the appropriate stopping criteria that can reproducibly and accurately identify those patients who should discontinue use of TLANDO. The CRL also identified additional comments that are not considered approvability issues.

On July 19, 2018, we completed a Post Action Meeting with the FDA in which the deficiencies raised in the CRL were discussed and a path forward for NDA resubmission for the potential approval of TLANDO was clarified. The FDA provided specific feedback on potential resolution of each deficiency, including clinical design elements where appropriate. We are currently conducting an ABPM clinical study in which we enrolled 138 subjects. We expect results during the first quarter of 2019. The ABPM clinical study is an uncontrolled study and is being conducted to assess TLANDO's effect on blood pressure, if any, and to assist the FDA in determining the appropriate regulatory actions for TLANDO related to blood pressure effects, if any. FDA regulatory action will depend on the findings of the ABPM clinical study, including whether risk mitigation beyond labeling, such as Risk Evaluation and Mitigation strategy ("REMS"), could ensure the benefits of TLANDO outweigh the risks. Subsequent to our Advisory Committee meeting for TLANDO on January 10, 2018, we conducted a pilot phlebotomy study to assess whether *ex vivo* conversion of TU to T in serum blood collection tubes occurs post collection. As described more fully below, we completed our definitive phlebotomy study in the fourth quarter of 2018 based on FDA study design feedback to exclude any potential clinically meaningful ex vivo TU to T conversion post collection. The definitive phlebotomy study results suggest that there is no significant *ex vivo* TU to T conversion with testosterone measurements when processed within 30 minutes of sample collection under the tube manufacturer's recommended conditions and consistent with DV Phase 3 instructions and compared against the FDA's recommended time zero control (processed immediately) T measurement. Finally, we are performing additional analyses of existing data in order to address the Cmax deficiency and dose stopping criteria deficiency identified by the FDA. Although there is no guarantee that TLANDO will ever be approved by the FDA, we believe the data analyses we are performing together with the results from the definitive phlebotomy study and the on-going ABPM clinical study should address the deficiencies identified by the FDA in its CRL. Assuming results from the APBM clinical study support resubmission of the TLANDO NDA, we expect resubmission to occur mid-2019 followed by a six-month review by the FDA upon FDA acceptance. There can be no assurances as to the timing or acceptance of our NDA by the FDA.

*Results from the Definitive Phlebotomy Study*

The definitive phlebotomy study was designed based on the FDA's protocol recommendations and conducted in response to a deficiency cited in the TLANDO CRL by the FDA to confirm the reliability of TLANDO Phase 3 study results and to assess the impact of any material deviation from instructions on sample collection/processing times by clinical sites.

The definitive phlebotomy study measured testosterone concentrations in blood samples collected in plain serum separation tubes ("SST") at three-hour and five-hour time points (N=24) post dose and processed within 30 minutes of sample collection under the tube manufacturer's recommended conditions and consistent with Phase 3 instructions. The definitive phlebotomy study enrolled 12 hypogonadal male subjects and dosed subjects with a single oral 225 mg TU dose of TLANDO. The testosterone measurements in SST were compared against the FDA's recommended time zero control (processed immediately) measurement of testosterone concentrations in blood samples in plasma tubes with EDTA ("PT") to assess *ex vivo* conversion, if any.

The top-line results of the definitive phlebotomy study demonstrated that the overall (N=24) mean percentage difference and the associated percentage standard deviation post dose of testosterone concentrations measured between SST samples and PT samples are -1.0% and 9.2%, respectively. This difference was not statistically significant (p = 0.91) which suggests no significant *ex vivo* TU to T conversion occurrence with T measurements processed within 30 minutes of sample collection under the SST manufacturer's recommended conditions and consistent with Phase 3 instructions.

*Results from DV and DF Studies*

The DV and DF studies were both an open-label, fixed dose (no titration), single treatment clinical study of oral TRT in hypogonadal males with low testosterone (T) (< 300 ng/dL) that assessed TLANDO in hypogonadal males on a fixed daily dose of 450 mg divided into two equal doses ("BID") in the DV study and into three equal doses ("TID") in the DF study. In total, 95 and 100 subjects were enrolled into DV and DF studies, respectively, with 94 and 98 subjects completing the DV and DF studies, respectively.

Although there is no guarantee of FDA approval of TLANDO, we believe the results from the DV study confirm the validity of a fixed dose approach without the need for dose titration to orally administering TLANDO. The DV study will be considered our pivotal efficacy clinical study for the NDA resubmission. TLANDO successfully met the FDA primary efficacy guidelines in the DV study safety statistical analysis set ("SS") where 80% of the subjects achieved average testosterone levels ("Cavg") within the normal range with a lower bound confidence interval ("CI") of 72%. The DF study restored 70% of the subjects' average testosterone levels within the normal range (Cavg) confirming that twice daily ("BID") dosing is the appropriate dosing regimen for TLANDO and was the basis for resubmission. The safety set is defined as any subject that was randomized into the study and took at least one dose (N=95 subjects in the DV study and N=100 in the DF study). A baseline carried forward approach was used to account for missing data as a result of subject discontinuation.

The primary efficacy endpoint is the percentage of subjects with Cavg within the normal range, which is defined as 300-1080 ng/dL. The FDA guidelines for primary efficacy success is that at least 75% of the subjects on active treatment achieve a testosterone Cavg within the normal range; and the lower bound of the 95% CI must be greater than or equal to 65%.

The adverse event profile of TLANDO in both the DV and DF studies was consistent with the previously conducted 52-week Phase 3 Study of Androgen Replacement ("SOAR") clinical trial. All drug related adverse events ("AEs") were either mild or moderate in intensity and none were severe. To date, the safety database of TLANDO includes ~591 subjects demonstrating a profile consistent with other TRT products.

The secondary endpoints assessed the maximum total testosterone concentration ("Cmax") post dosing using predetermined limits developed by the FDA for transdermals. The FDA guidelines for secondary efficacy success is that at least 85% of the subjects achieve Cmax less than 1500 ng/dL; no greater than 5% of the subjects have Cmax between 1800 ng/dl and 2500 ng/dL; and zero percent of the subjects have Cmax greater than 2500 ng/dL. Consistent with the definition of Cmax and the pharmacokinetic profile of multiple times a day dosing, two pre-specified analyses were performed, Cmax per dose and Cmax per day.

In the DV study SS Cmax per dose analysis, the percentage of subjects with Cmax less than 1500 ng/dL and between 1800 ng/dL and 2500 ng/dL were 85% and 7%, respectively. Deviations from the predetermined limits in the DV study were observed in the Cmax per day dose analysis for these thresholds. Only one subject, who was a major protocol violator, exceeded the 2500 ng/dL limit independent of per dose or per day dose analyses.

The DF study SS met all Cmax thresholds in per dose and per day dose analyses.

Prior to conducting the DV study and the DF study, we completed our SOAR pivotal Phase 3 clinical study evaluating efficacy and 52-week safety of TLANDO. The SOAR study is considered our pivotal safety clinical study for the NDA resubmission.

***We depend primarily on the success of our lead product candidate, TLANDO, for which we previously received a Complete Response Letter from the FDA and which may not receive regulatory approval or be successfully commercialized.***

TLANDO is currently our only product candidate that has completed Phase 3 clinical trials, and our business currently depends primarily on its successful development, regulatory approval and commercialization, if approved. We submitted an NDA to the FDA and have received two CRL's but have not submitted comparable applications to other regulatory authorities. If the FDA denies or further delays approval of TLANDO, our business would be materially and adversely harmed. If the FDA does approve TLANDO, but we are unsuccessful in commercializing TLANDO, our business will be materially and adversely harmed.

Although we have completed Phase 3 efficacy trials with TLANDO, approval from the FDA is not guaranteed. On June 28, 2016, we received a CRL from the FDA on our original NDA submission. A CRL is a communication from the FDA that informs companies that an application cannot be approved in its present form. The CRL identified a deficiency related to the dosing algorithm for the label. Specifically, the proposed titration scheme for clinical practice was significantly different from the titration scheme used in the Phase 3 trial leading to discordance in titration decisions between the Phase 3 trial and real-world clinical practice. In response to the CRL, we met with the FDA in a Post Action Meeting and proposed a dosing regimen to the FDA based on analyses of existing data. The FDA noted that while the proposed dosing regimen might be acceptable, validation in a clinical trial would be needed prior to resubmission. The DV study was conducted in response to the FDA's request.

We re-submitted our NDA to the FDA in August 2017 based on the results of the DV study. The DV study confirmed the efficacy of TLANDO with a fixed dose regimen without need for dose adjustment. TLANDO was well tolerated upon 52-week exposure with no reports of drug related Serious Adverse Events ("SAEs"). Subsequent to our Advisory Committee meeting for TLANDO on January 10, 2018, we conducted a pilot phlebotomy study to assess whether *ex vivo* conversion of TU to T in serum blood collection tubes occurs post collection. On May 8, 2018 TLANDO received a CRL from the FDA regarding our NDA. The CRL identified four deficiencies which include the following: determining the extent, if any, of clinically meaningful ex vivo conversion of TU to T in serum blood collection tubes to confirm the reliability of T data; obtaining definitive evidence pre-approval via an ABPM study as to whether TLANDO causes a clinically meaningful increase in blood pressure in hypogonadal men, which is a surrogate marker of predicting cardiovascular outcomes; verifying the reliability of Cmax data and providing justification for non-applicability of the agreed-upon and pre-specified Cmax secondary endpoints for TLANDO; and, determining the appropriate stopping criteria that can reproducibly and accurately identify those patients who should discontinue use of TLANDO. The CRL also identified additional comments that are not considered approvability issues.

On July 19, 2018, we completed a Post Action Meeting with the FDA in which the deficiencies raised in the CRL were discussed and a path forward for NDA resubmission for the potential approval of TLANDO was clarified, although no assurance can be given that such approval will be received. The FDA provided specific feedback on potential resolution of each deficiency, including clinical design elements where appropriate. We conducted a definitive phlebotomy study based on FDA study design feedback to exclude any potential clinically meaningful *ex vivo* TU to T conversion post collection and we are currently conducting an ABPM clinical study for which we have completed enrollment and we expect results during the first quarter of 2019. The findings from the ABPM clinical study may not be sufficient to address the associated deficiency. Additionally, if the results of the ABPM clinical study show a clinically meaningful increase in blood pressure, we may not be able to successfully respond to the CRL, which would significantly impact our ability to receive approval of TLANDO. In our 52-week SOAR trial, which included an Androgel 1.62% comparator arm, and based on the morning single cuff measurement, TLANDO had a consistent decrease from baseline in mean systolic blood pressures (ranging from -0.3 to -1.1 mmHg across visits) and mean diastolic blood pressures (ranging from -0.8 to -3.0 mmHg across visits). These changes were similar to those seen with Androgel 1.62% (mean changes of 0.0 to -3.1 mmHg for systolic blood pressure and of -0.9 to 1.1 mmHg for diastolic blood pressure). At some visits there was a mean and median increase in heart rate of 2-3 beats per minute for TLANDO and 3-4 beats per minute for Androgel 1.62%. Additionally, some patients experienced a significant increase in blood pressure with both TLANDO and Androgel 1.62% while some patients experienced significant decrease in blood pressure with both TLANDO and Androgel 1.62%.

Finally, we are performing additional analyses of existing data in order to address the Cmax deficiency and dose stopping criteria deficiency identified by the FDA. Although there is no guarantee that TLANDO will ever be approved by the FDA, we believe the data analyses we have performed to date together with the results from the on-going ABPM clinical study and the definitive phlebotomy study should address the deficiencies identified by the FDA in their CRL. Resubmission of the TLANDO NDA is expected mid-2019. The FDA may not accept the resubmitted TLANDO NDA due to a variety of reasons, including not addressing all the previously identified deficiencies or not including all requested clinical data, including clinical study reports.

**Exhibit E, Page 73**

Even if we resubmit our NDA for TLANDO, we may receive another CRL from the FDA which would result in substantial delays and additional studies and expense before we would be in a position to resubmit an NDA responsive to such additional CRL. Our ability to raise capital may also be impaired. If we proceed with any study, we face the risk that the FDA would not agree with the design or results of the study. In addition, the results from the ABPM clinical study may find that TLANDO's effects on blood pressure are clinically meaningful and approval of TLANDO may never occur.

The FDA may also ask us to perform additional clinical trials or studies, such as the ABPM clinical study, or provide additional information in order to secure approval. Any such requirement would increase our costs and delay approval and commercialization of TLANDO and would have a material adverse effect on our business and financial condition.

Even if TLANDO is approved, the FDA may limit the indications for which it may be used, include extensive warnings on the product labeling, or require costly ongoing requirements for post-marketing clinical studies including participation in a long-term TRT consortium cardiovascular study and surveillance or other risk management measures to monitor the safety or efficacy of TLANDO. Further, in the event that we seek regulatory approval of TLANDO outside the United States, such markets also have requirements for approval of drug candidates with which we must comply prior to marketing. Obtaining regulatory approval for marketing of TLANDO in one country does not ensure we will be able to obtain regulatory approval in other countries but a failure or delay in obtaining regulatory approval in one country may have a negative effect on the regulatory process in other countries.

Any regulatory approval of TLANDO, once obtained, may be withdrawn. Ultimately, the failure to obtain and maintain regulatory approvals would prevent TLANDO from being marketed and would have a material adverse effect on our business.

*If the FDA clarifies, modifies or restricts the indicated population for T-replacement in the "class" label, the market for T-replacement products may shrink and our ability to sell and be reimbursed for TLANDO and LPCN 1111 could be materially adversely affected and our business could be harmed.*

On September 17, 2014, the FDA held a T-class Advisory Committee meeting. The Advisory Committee discussed (i) the identification of the appropriate patient population for whom T-replacement therapy should be indicated and (ii) the potential risk of major adverse cardiovascular events, defined as non-fatal stroke, non-fatal myocardial infarction and cardiovascular death associated with T-replacement therapy. At the meeting, 20 of the 21 members of the Advisory Committee voted that the FDA should revise the currently indicated population for T-replacement therapy and recommended changing the label language to restrict the intended uses of the products, particularly in relation to age-related low testosterone. The Committee also supported adding language to the label to guide physicians in better diagnosis of eligible patients for treatment. On March 3, 2015, the FDA issued a safety announcement addressing the Advisory Committee's recommendations.

The FDA's safety assessment recommended the following label modifications/restrictions in the indicated population for T-replacement therapy:

- limiting use of T-replacement products to men who have low testosterone caused by certain medical conditions;
- prior to initiating use of T-replacement products, confirm diagnosis of hypogonadism by ensuring that serum testosterone has been measured in the morning on at least two separate days and that these concentrations are below the normal range;
- adding cautionary language stating that the safety and efficacy of TRT products with age-related hypogonadism have not been established; and
- adding cautionary language stating that some studies have shown an increased risk of myocardial infarction and stroke associated with use of T-replacement products.

The actual TRT label revisions have been finalized between the FDA and sponsors with approved T-replacement therapy products. The revised labels are consistent with the FDA's recommendations on March 3, 2015.

**Exhibit E, Page 74**