**THE ROSEN LAW FIRM, P.A**.
Phillip Kim (*Pro Hac Vice*)
Daniel Tyre-Karp (*Pro Hac Vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
          dtyrekarp@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**JAMES DODGE RUSSELL & STEPHENS, P.C.**
Mitchell A. Stephens (11775)
10 West Broadway, Suite 400
Salt Lake City, UT 84101
Telephone: (801) 363-6363
Email: mstephens@jdrslaw.com

*Liaison Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SOLOMON ABADY, Individually and on behalf of all others similarly situated,<br><br>    *Plaintiff,*<br><br>v.<br><br>LIPOCINE INC. and MAHESH V. PATEL,<br><br>    *Defendants.* | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>Civil No. 2:19-cv-00906-CW-CMR<br><br>District Judge Clark Waddoups<br>Magistrate Judge Cecilia M. Romero |

## **TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ........................................................................................1

II.     STATEMENT OF FACTS ..............................................................................................4

        A.      Lipocine and TLANDO ......................................................................................4

        B.      Lipocine's Second Failed Attempt at TLANDO Approval ...................................5

        C.      Lipocine Desperately Attempts to Remain Viable While Preparing Third Attempt
                at TLANDO Approval ........................................................................................6

        D.      Defendants Make False and Misleading Statements to Investors...........................7

        E.      The Truth Emerges. ...........................................................................................9

III.    ARGUMENT................................................................................................................10

        A.      Investors Sufficiently Allege False or Misleading Statements and Omissions .....10

                1.      Defendants Made Materially False Statements During the Class Period ..11

                2.      Defendants Concealed Material Facts They Had a Duty to Disclose ........13

        B.      Investors Adequately Allege Defendants' Scienter ...........................................18

                1.      Patel Was Intimately Involved in the Development and Attempted
                        Approval of TLANDO and Was Fully Aware of Contradicting Internal
                        Reports ...............................................................................................20

                2.      The Core Operation Theory Adds to Inference of Scienter ......................20

                3.      Defendants' Prior Settlement of Securities Fraud Action Related to
                        Previous TLANDO NDA Contributes to Inference of Scienter ................21

                4.      Defendants Had Motive to Commit Fraud................................................22

                5.      The Inference of Scienter is At Least as Strong as the Competing Non-
                        Culpable Inference ...............................................................................23

        C.      Investors Adequately Allege Loss Causation .....................................................24

IV.     CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

Other Authorities

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ........................................................................ 10, 19

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ....................................... 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................. 10

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ............................................................................... 21

*City of Philadelphia v. Fleming Companies, Inc.*,
  264 F.3d 1245 (10th Cir. 2001) ...................................................................... 19, 23

*Croker v. Carrier Access Corp.*,
  No. CIV.05CV01011LTB-OES, 2006 WL 2035366 (D. Colo. July 18, 2006)........................ 11

*Dura Pharm. Inc., v. Broudo*,
  544 U.S. 336 (2005)........................................................................................... 24

*Freeland v. Iridium World Commc'ns, Ltd.*,
  545 F. Supp. 2d 59 (D.D.C. 2008) ........................................................................ 25

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)........................................................................... 16, 17

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ............................................................................... 22

*Hirtenstein v. Cempra, Inc.*,
  348 F. Supp. 3d 530 (M.D.N.C. 2018) ................................................................... 24

*Hou Liu v. Intercept Pharm., Inc.*,
  No. 17-CV-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ................................ 16

*In re Advance Auto Parts, Inc., Sec. Litig.*,
  No. CV 18-212-RGA, 2020 WL 599543 (D. Del. Feb. 7, 2020) ........................................ 24

*In re Amgen Inc. Sec. Litig.*,
  No. CV072536PSGPLAX, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) .............................. 16

*In re Arrowhead Pharm., Inc. Sec. Litig.*,
No. CV 16-08505 PSG-PJW, 2017 WL 8791111 (C.D. Cal. Dec. 21, 2017) ......................... 23

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002) ................................................................................... 22

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .............................................................................. 25

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ................................. 16

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................................... 11

*In re Nuvelo, Inc. Sec. Litig.*,
668 F. Supp. 2d 1217 (N.D. Cal. 2009) ................................................................. 23

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) ...................................................................... 16

*In re SemGroup Energy Partners, L.P.*,
729 F. Supp. 2d 1276 (N.D. Okla. 2010) .............................................................. 19

*In re Synergen, Inc. Sec. Litig.*,
863 F. Supp. 1409 (D. Colo. 1994) ....................................................................... 17

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ...................................................................... 13, 14, 15

*In re Williams Sec. Litig.*,
339 F. Supp. 2d 1206 (N.D. Okla. 2003) .............................................................. 22

*Jun Zhang v. LifeVantage Corp.*,
No. 2:16-CV-965 TS, 2017 WL 2599883 (D. Utah June 15, 2017) ......................... 25

*Kessman v. Myriad Genetics, Inc.*,
No. 2:18-CV-00336-DAK, 2019 WL 1330363 (D. Utah Mar. 25, 2019) ................. 25

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................ 17

*Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*,
26 F.3d 375 (3d Cir. 1994) ................................................................................... 12

*Medina v. Clovis Oncology, Inc.*,
215 F. Supp. 3d 1094 (D. Colo. 2017) .............................................................. 22, 23

iii

*Nakkhumpun v. Taylor*,
   782 F.3d 1142 (10th Cir. 2015) ................................................................................... 24

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)......................................................................................... 10

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)...................................................................................................... 18

*Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*,
   372 F. Supp. 3d 1139 (D. Colo. 2019)................................................................... 20, 21

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) ....................................................................................... 16

*S.E.C. v. Curshen*,
   372 F. App'x 872 (10th Cir. 2010)............................................................................... 13

*S.E.C. v. Goldstone*,
   952 F. Supp. 2d 1060 (D.N.M. 2013) .......................................................................... 17

*S.E.C. v. Goldstone*,
   No. CIV. 12-0257 JB/GBW, 2015 WL 5138242 (D.N.M. Aug. 22, 2015)............................ 19

*S.E.C. v. Universal Express, Inc.*,
   No. 04 CIV. 2322 (GEL), 2007 WL 2469452 (S.D.N.Y. Aug. 31, 2007).............................. 16

*Smallen v. The W. Union Co.*,
   950 F.3d 1297 (10th Cir. 2020) ................................................................................... 19

*Stock Transfer, Inc. v. AE Biofuels, Inc.*,
   663 F. Supp. 2d 1056 (D. Colo. 2009).......................................................................... 10

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................................................... 18

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
   No. 09-12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)................................................ 16

*Yanek v. Staar Surgical Co.*,
   388 F. Supp. 2d 1110 (C.D. Cal. 2005) ....................................................................... 18

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
   426 F. Supp. 3d 864 (D. Kan. 2019)....................................................................... 15, 21

Statutes

15 U.S.C. § 78u–4(b)(1) ...........................................................................................................10

15 U.S.C. § 78u-4(b)(2) ...........................................................................................................18

Rules

Fed. R. Civ. P. 9(b) ..................................................................................................................10

Fed. R. Civ. P. 15(a)(2) ............................................................................................................25

Lead Plaintiff Sergus Thomas and Named Plaintiff Thomas Parkinson (collectively, "Investors") hereby oppose Defendants' motion to dismiss (Dkt. No. 47) (the "Motion").

## I.  PRELIMINARY STATEMENT

Lipocine Inc. ("Lipocine") is a small, cash-strapped pharmaceutical company that has never brought a drug to market in its 23 years of existence. Following the Food and Drug Administration's ("FDA") second rejection of its lead-drug prospect (TLANDO) in 2018, Lipocine was struggling to remain viable. Lipocine had never generated any material revenue. 2018 was no exception, as Lipocine lost $11.7 million and had accumulated over $138 million in deficit. The Company admitted it was reliant on stock sales and financing to continue operations.

Against this backdrop, Lipocine began 2019 touting the prospects of its third attempt at FDA approval for TLANDO, a testosterone replacement. Lipocine told investors that it had resolved the four deficiencies identified in the FDA's 2018 rejection of TLANDO, including TLANDO's failure to meet any of the FDA's three pre-specified secondary endpoints for maximum testosterone ("Cmax"). The strategy worked. Lipocine raised over $6 million from investors in the first three months of 2019 after raising just $700,000 in all of 2018. Unbeknownst to investors, Lipocine had done nothing to address its Cmax deficiency in its rush to submit its third FDA application for TLANDO. In place of tangible improvements to TLANDO's Cmax problems, Lipocine instead turned to misstatements and omissions to maintain investors' confidence.

Throughout 2019, Defendants repeatedly misled investors about which metric the FDA used to measure Cmax and concealed the relevant Cmax data for TLANDO while touting the data from a metric the FDA has never used. Defendants told investors that TLANDO "met a key secondary endpoint" and had "[o]ther secondary endpoints generally consistent with approved products" despite knowing that TLANDO missed all three secondary endpoints and that the FDA had never

approved another drug with remotely similar Cmax data. Defendants' material misstatements proved costly to investors when the FDA rejected TLANDO for a third time in November 2019. The sole reason the FDA cited for the rejection was TLANDO's failure to meet any of the Cmax secondary endpoints. Defendants' misinformation campaign was so successful that several analysts—relying on the irrelevant Cmax data Defendants touted rather than the relevant Cmax data Defendants concealed—expressed shock that TLANDO had been rejected given that a competitor with similar Cmax had been approved earlier in the year. When the truth about Cmax was revealed, Lipocine's stock price fell $1.93 per share, or 70.7%, to close at $0.80.

The Motion offers a smorgasbord of faulty arguments to argue that the alleged misstatements are not actionable. First, Defendants offer a "truth on the market" affirmative defense to argue that the misstatements are immaterial as a matter of law because the relevant Cmax data was published on the FDA website in 2018—a year before the start of the Class Period. To dismiss on a "truth on the market" theory, a court must conduct a fact-intensive inquiry that is inappropriate at the pleading stage and places the burden on Defendants to show that the prior disclosures were conveyed with sufficient "intensity and credibility" to dispel the false impression created by later misrepresentations. Defendants do not even attempt to meet this burden. Defendants present no facts that show that during the Class Period the market was aware of the FDA website data and if it was, whether it entered the market sufficiently to offset Defendants' false and misleading statements. Rather, when the true details were disclosed at the end of the Class Period the price of Lipocine's stock dropped—further showing the market was unaware of the FDA website data. Defendants alternatively frame this argument by stating that Defendants had no duty to disclose any omitted information that was available on the FDA website. But it is black letter law that once Defendants elected to disclose material facts, they must speak truthfully, and provide complete

2

and non-misleading information with respect to the subjects on which they undertake to speak.

Second, Defendants argue that certain alleged misstatements are non-actionable because they were subjectively believed opinions about how clinical data should be interpreted. This argument fails because it misstates both the law and the facts. Certain of these statements—including Defendants' statement that TLANDO "met a key secondary endpoint"—are not pure opinions because they are determinate and verifiable. Further, to the extent any of the challenged statements are opinions, they are still actionable because Investors plead the underlying facts of which Defendants had knowledge, the context in which they arose, and why they rendered the opinions misleading. Defendants also argue that misleading statements about the likelihood of FDA approval are not actionable because Defendants warned investors that approval was not certain. Courts routinely reject generic risk disclosures that are equally applicable to any drug company.

The Motion also fails to undermine the Complaint's strong inference of scienter or offer a more compelling inference. Critically, the Motion admits that "it is clear" that Defendants were fully aware of the omitted facts that the Complaint alleges were concealed and misstated. First, Defendants cite an out-of-circuit case where the plaintiff alleged that the defendants knew the FDA would reject a drug to argue that Investors here must allege that Defendants knew the FDA would reject TLANDO in order to plead scienter. Investors here do not make that allegation and are not bound by a plaintiff's overstated claims in an unrelated case. The Motion also claims that Patel purchased stock during the Class Period, which Defendants argue undermines any inference of scienter, but Patel did not actually purchase any Lipocine stock during the Class Period.

Finally, Investors plausibly allege that Defendants' misstatements inflated the price of Lipocine's securities, the price of Lipocine's securities fell significantly when the truth of Defendants' misstatements was revealed, and Investors thereby suffered losses. These allegations

3

are sufficient at the motion to dismiss stage. The Court should deny the Motion in its entirety.

## II. STATEMENT OF FACTS

### A. Lipocine and TLANDO

Lipocine is a Delaware specialty pharmaceutical company headquartered in Salt Lake City, Utah. ¶30.[1] Patel has served as President, Chief Executive Officer, and Director of Lipocine since co-founding the Company in 1997 and served as Chairman throughout the Class Period.[2] ¶25. Lipocine has never had a product approved by the Food and Drug Administration (the "FDA"), has never generated any revenue from product sales, and had accumulated over $138 million in deficit by the end of 2018. ¶3. As of the end of 2018, the Lipocine had only ten full-time employees and only five full-time employees engaged in drug development activities. ¶32.

Lipocine's lead product candidate is TLANDO, an oral testosterone replacement therapy for adult males with hypogonadism. ¶¶2, 31, 33. TLANDO is the only product candidate for which Lipocine has ever submitted a New Drug Application ("NDA") to the FDA.

The FDA requires that efficacy trials for testosterone replacement products meet both primary and secondary endpoint. ¶41. The required secondary endpoints assess for unacceptably high maximal exposures to testosterone that could raise safety concerns by measuring the highest testosterone level a subject reaches in a single 24-hour day ("Cmax"). ¶¶ 42-43. The pre-determined Cmax limits for the secondary endpoints are: (1) Cmax ≤ 1500 ng/dL in at least 85% of subjects; (2) Cmax between 1800 and 2500 ng/dL in not more than 5% of subjects; and (3)

---

[1] Unless otherwise noted, all references to "¶__" are to paragraphs in the Amended Complaint (Dkt. No. 44) (the "Complaint"), and citations to "Ex." refer to exhibits attached to the Declaration of Ryan E. Blair (Dkt. No. 48). Unless otherwise noted, all internal quotation marks, ellipses, brackets, and citations are omitted.

[2] The Class Period is January 28, 2019 through November 11, 2019, both dates inclusive.

4

Cmax > 2500 ng/dL in no subject. ¶43.

Lipocine submitted the original NDA for TLANDO on August 31, 2015 and received a Complete Response Letter ("CRL") from the FDA in June 2016 rejecting the 2015 NDA based on the fact that the dosing regimen used in the clinical study upon which the NDA relied "differed significantly" from the dosing regimen proposed in the 2015. ¶¶36-37.

### B.  Lipocine's Second Failed Attempt at TLANDO Approval

In response to the 2016 CRL and the follow-up Post Action Meeting with the FDA, Lipocine conducted two clinical studies to validate its new proposed dosing regimen: the Dosing Validation Study ("DV Study") and the Dosing Flexibility Study ("DF Study"). ¶¶38-39. Lipocine announced the results of the DV and DF Studies in June 2017 and resubmitted the TLANDO NDA to the FDA in August 2017 based on the results of the DV Study. ¶44.

In January 2018, the FDA held a Bone, Reproductive, and Urologic Drugs Advisory Committee Meeting to discuss the pending TLANDO NDA (the "BRUDAC Meeting"). ¶45. In both the briefing materials and the Meeting itself, Lipocine and the FDA agreed that (i) the secondary endpoints were based on Cmax measured "per day"; and (ii) none of the three secondary endpoints were met. ¶¶46-50. Notably, none of the briefing documents, presentations, or speakers from either the FDA or Lipocine even mentioned as a relevant criterion —much less discussed— the "per dose" analysis that Defendants repeatedly highlighted to investors. ¶¶46-51.[3]

---

[3] The "per dose" analysis measures Cmax in the 12-hour periods following both the morning and evening doses of TLANDO. Under this measure, there are two observations for each of the 95 subjects or a total of 190 observations. ¶14. The day before the BRUDAC Meeting, BRUDAC held a meeting with Clarus concerning the Jatenzo NDA. ¶52. The Jatenzo NDA also proposed a twice daily dosage, with subjects in the Jatenzo efficacy study receiving a morning dose and an evening dose. When discussing the secondary endpoints, the briefing documents and presentations from both Clarus and the FDA focused entirely on the Cmax "per day" measurement. ¶52.

5

Thirteen of nineteen BRUDAC members concluded that the overall risk/benefit profile of TLANDO was unacceptable, in part due to TLANDO's failure to meet the secondary efficacy endpoints for Cmax. ¶53. On May 8, 2018, the Company received a second CRL from the FDA regarding the TLANDO NDA identifying four deficiencies, including: verifying the reliability of Cmax data and providing justification for non-applicability of the agreed-upon and prespecified Cmax secondary endpoints for TLANDO. ¶54.

C. **Lipocine Desperately Attempts to Remain Viable While Preparing Third Attempt at TLANDO Approval**

Without any marketable products and desperate for cash, Lipocine took out a $10 million loan on January 5, 2018—just five days before the BRUDAC Meeting. ¶55. In recognition of Lipocine's perilous financial situation, the loan included a clause triggered by the May 2018 FDA rejection of TLANDO that required Lipocine to maintain at least $5 million of cash collateral until TLANDO is approved by the FDA. ¶55. Beginning on January 1, 2019, the loan required Lipocine to repay $275,000 plus interest monthly until the loan matures in December 2021, at which point Lipocine would owe a final $650,000 lump sum final payment. ¶56.

In January 2019, still bleeding cash and lacking income, Lipocine turned to selling shares of its common stock to finance its operations. ¶57. Lipocine decided to prematurely push a third submission of the TLANDO NDA to generate interest in Lipocine stock despite not having resolved the issues identified in the 2018 CRL. ¶57. The strategy was successful, and Lipocine raised $6.2 million through sales of its common stock in just the first three months of 2019—nearly nine times as much as the $700,000 Lipocine raised in all of 2018. ¶57.

Lipocine needed the loan and capital raise to keep the Company viable through a third attempt at approval for TLANDO. Lipocine devoted over 85% of its $4 million external research

development costs to TLANDO in 2018 and incurred another $1.3 million in external research and development costs for TLANDO in the first quarter of 2019—accounting for over 94% of the Company total external research and development costs for the quarter. ¶31. Lipocine conducted further studies to address certain of the deficiencies identified in the CRL, but rather than taking the required time, effort, and expenses to attempt to address the Cmax deficiency, Defendants instead chose to mislead investors in a rush to secure enough cash to continue operating. ¶¶58-59.

### D. **Defendants Make False and Misleading Statements to Investors**

Throughout the Class Period, Defendants repeatedly made materially false statements and omissions that misled Investors about TLANDO's failure to meet the required Cmax secondary endpoints and the significant impediment such failure represented to TLANDO's chances of FDA approval. Crucially, during the Class Period Defendants never disclosed (i) TLANDO's Cmax secondary endpoints for the "per day" analysis, (ii) that the FDA's pre-determined Cmax requirement was based on the "per day" analysis, or (iii) that the FDA could reject the TLANDO NDA for failing to meet the Cmax secondary endpoints. ¶62. Each of Lipocine's quarterly and annual SEC filings (¶¶62, 76, 84, 90) contained the same materially misleading statements:

> The FDA guidelines for secondary efficacy success is that at least 85% of the subjects achieve Cmax less than 1500 ng/dL; no greater than 5% of the subjects have Cmax between 1800 ng/dl and 2500 ng/dL; and zero percent of the subjects have Cmax greater than 2500 ng/dL. Consistent with the definition of Cmax and the pharmacokinetic profile of multiple times a day dosing, two pre-specified analyses were performed, Cmax per dose and Cmax per day.

> In the DV study SS Cmax per dose analysis, the percentage of subjects with Cmax less than 1500 ng/dL and between 1800 ng/dL and 2500 ng/dL were 85% and 7%, respectively. Deviations from the predetermined limits in the DV study were observed in the Cmax per day dose analysis for these thresholds. Only one subject, who was a major protocol violator, exceeded the 2500 ng/dL limit independent of per dose or per day dose analyses.

> The DF study SS met all Cmax thresholds in per dose and per day dose analyses.

7

These statements and omissions, taken together, created the false impression that the "per dose" analysis was more important than the "per day" analysis, that TLANDO had come very close to meeting the Cmax secondary endpoint requirements, that the and, as a result, the Cmax secondary endpoints did not pose a significant impediment to the FDA approving TLANDO. In reality, the "per day" analysis is the only method used by the FDA (¶¶46-50), both Lipocine and the FDA focused exclusively on the "per day" analysis at the BRUDAC Meeting and related briefing (*id.*), both Lipocine and the FDA agreed that the DV Study missed on all three Cmax secondary endpoints (*id.*), the DF Study meeting the secondary endpoints is irrelevant because it failed to meet the primary endpoints, and the failure to meet the "per day" Cmax secondary endpoints was potentially fatal to the TLANDO NDA. ¶¶ 61-62.

Defendants also misled Investors beyond its quarterly and annual filings with the SEC. In a January 28, 2019 corporate presentation, Defendants stated that TLANDO had "[m]et key secondary endpoint" because there were "[N]o eligible subjects with T levels >2500 ng/dL." ¶¶71-72. This statement was false; TLANDO missed all three secondary endpoints, including the "key" endpoint of having no subjects over 2500 ng/dL. In their respective presentations at the BRUDAC Meeting, both Lipocine and the FDA acknowledged that TLANDO missed all three secondary endpoints. ¶¶46-50. Further, the FDA explicitly rejected the argument that the one subject who was over 2500 ng/dL should be excluded from the analysis because of his protocol violation, finding it "unclear" whether his protocol violation contributed to his elevated Cmax. ¶70. The January 28, 2019 corporate presentation also stated that "["o]ther secondary endpoints generally consistent with approved products." This statement was false; the FDA had never approved a product with similar secondary endpoints. ¶¶64-65.

8

On May 1, 2019, a Lipocine corporate presentation included a slide subtitled "Profile Demonstrated Clinically with Target Label Regimen." ¶¶ 80-81. Under a column labeled "Efficacy," the slide gave a false impression that TLANDO had clinically demonstrated a "[j]ustification for non-applicability of Cmax based missed secondary endpoints." *Id*. In fact, the FDA had not—and has not—accepted any such justification. ¶¶71-72.

Finally, on September 24, 2019, an analyst for Ladenburg Thalmann asked Patel to "give us a sense in terms of how your interaction has been with the FDA kind of going into the last month here, roughly, and what your sense is given, it seems as though you addressed the four issues that you had in the CRL previously . . . ." ¶¶ 92-93. Patel responded that Lipocine believed it had adequately addressed all four deficiencies identified in the 2018 Complete Response Letter and was "cautiously optimistic" and "hopeful" of approval "in light of seeing that FDA has recently approved two products some few injections as well as an oral product triclabendazole earlier this year." This statement misled Investors by continuing to foster the false impression that TLANDO's failure to meet the Cmax secondary endpoints was similar to Jatenzo's near-miss of those endpoints, which had not precluded Jatenzo from approval. ¶¶ 10, 65-70, 92-93.

### E. The Truth Emerges.

On November 11, 2019, Lipocine disclosed that it had received a Complete Response Letter from the FDA rejecting the TLANDO NDA for the third time. ¶94. The CRL identified just one deficiency—the one Defendants spent the entire Class Period misleading Investors about— the efficacy trial did not meet the three secondary endpoints for maximal testosterone concentrations ('Cmax')." *Id*. In response to this corrective disclosure, Lipocine's stock plummeted $1.93 per share, or 70.7%, to close at $0.80 per share on November 11, 2019. ¶95.

## III.   ARGUMENT

To state a claim for a violation of Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must allege, as Plaintiff has here: (1) a misrepresentation or omission of material fact in connection with the purchase or sale of a security; (2) Defendants' scienter; (3) reliance; and (4) resulting damage. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007). F.R.C.P. 9(b) provides that fraud should be pleaded with particularity, which means that the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). All factual allegations are to be accepted as true, and all reasonable inferences drawn in Plaintiff's favor. A complaint need only "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

### A.  Investors Sufficiently Allege False or Misleading Statements and Omissions

To state a valid Rule 10b–5 claim, a plaintiff must first plead that the defendant made an untrue or misleading statement of fact or failed to state a fact necessary to make a statement not misleading. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099–1100 (10th Cir. 2003). A plaintiff must "specify each statement alleged to have been misleading [and] the … reasons why the statement is misleading...." 15 U.S.C. § 78u–4(b)(1). "A common-sense, case-by-case approach will edify any determination of whether the facts alleged are sufficient under this standard, requiring courts to determine whether, taken as a whole, the facts alleged support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Corp. Stock Transfer, Inc. v. AE Biofuels, Inc.*, 663 F. Supp. 2d 1056, 1066 (D. Colo. 2009). Neither the PSRLA nor Rule 9(b) requires a plaintiff to plead evidence in their

10

complaint. *Croker v. Carrier Access Corp.*, No. CIV.05CV01011LTB-OES, 2006 WL 2035366, at \*12 (D. Colo. July 18, 2006).

The Complaint identifies each false or misleading statement, who made the statement, and explains in detail how they misled investors. This is all that is required under the PSLRA.[4]

### 1. Defendants Made Materially False Statements During the Class Period

In a January 28, 2019 corporate presentation, Defendants falsely stated that TLANDO had "[m]et key secondary endpoint" because there were "[n]o eligible subjects with T levels >2500 ng/dL." ¶¶71-72. This statement was false; TLANDO missed all three secondary endpoints. including the "key" endpoint of having no subjects over 2500 ng/dL. In their respective presentations and briefing documents for the BRUDAC Meeting, both Lipocine and the FDA acknowledged that TLANDO missed all three secondary endpoints. ¶¶15, 46-50, 70. The falsity of this statement was further confirmed by the FDA's November 2019 CRL. ¶94. "When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011).

Defendants' creative and contradictory arguments otherwise are unconvincing. First, Defendants argue that the statement is neither false nor misleading because the FDA's purported "lack of clarity" on whether or not the third secondary endpoint was met. This argument fails because it ignores the FDA's repeated clarity on this issue. ¶48 ("the secondary efficacy endpoint was not met for any of the predetermined limits"); ¶49 ("As you can see, Tlando did not meet any

---

[4] Defendants improperly allege the Complaint is a "puzzle pleading" as a pretext to attach a misleading "Appendix." Motion at 10-11. The adequacy of a pleading is determined by the entire pleading, not just the portions Defendants unilaterally decide are relevant.

11

of these three standard secondary endpoint criteria"); ¶50 ("Tlando met the primary efficacy endpoint, but none of the predetermined limits of the secondary endpoint"). Further, Defendants undermine their own argument by repeatedly stating elsewhere in the Motion that TLANDO did not meet any of the three secondary endpoints.[5] Defendants cannot simultaneously claim that (i) Lipocine repeatedly disclosed that TLANDO missed all three secondary endpoints and that the market was fully aware of this information; and (ii) Lipocine "actually and reasonably believed" that TLANDO met one of the secondary endpoints, and there was a "lack of clarity" on this issue.[6]

The same January 2019 presentation slide also falsely stated that TLANDO's "[o]ther secondary endpoints [were] generally consistent with approved products." ¶72. In fact, the FDA had never approved any products with endpoints similar to TLANDO. ¶64. No other approved product had fewer than 82.8% of subjects with Cmax less than 1500 ng/dL (TLANDO had 74%) or with more than 5.6% of subjects with Cmax between 1800 ng/dL and 2500 ng/dL (TLANDO had 14%). ¶¶62, 65. The Motion does not—and cannot—contest the falsity or materiality of this statement. *See, e.g., Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief").

---

[5] *See* Motion at 4 ("Lipocine disclosed that it did not meet any of the secondary endpoints"); *id.*, at 4-5 ("The FDA observed that under the 'per day' analysis, the DV Study did not meet either the key secondary endpoint, or the other two secondary endpoints"); *id.* at 12 ("throughout the Class Period, Lipocine reiterated that the secondary endpoints were not met"); *id.* at 25 (the corrective disclosure stating TLANDO "had not met three secondary endpoints for Cmax" revealed no new information because "[t]he *fact* that the trial did not meet the secondary endpoints" had been public knowledge since 2017) (emphasis added).

[6] The Motion also falsely states that "Plaintiffs do not allege that Lipocine ever denied that the results from DV Study based on the 'per day' analysis fell outside the predetermined limits. Nor could they." Motion at 12 & n.14. This argument is particularly brazen given that it comes just before the Motion devotes an entire page defending Lipocine's Class Period denial that TLANDO had missed all three secondary endpoints. Motion at 16-17; ¶¶70-73.

12

### 2.   Defendants Concealed Material Facts They Had a Duty to Disclose

Defendants made numerous detailed and descriptive disclosures throughout the Class Period discussing the results of the DV Study, the measurement of Cmax secondary endpoints, the comparison between TLANDO's secondary endpoints to those of approved drugs, and how these issues related to Lipocine's ability to win FDA approval for TLANDO. ¶¶62, 72, 76, 84, 90. These voluntary disclosures of material facts obligated Defendants to provide truthful and complete information about these topics. *See S.E.C. v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010) ("where a party without a duty elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information with respect to the subjects on which he undertakes to speak"). Defendants' omission of material facts are actionable because they rendered Defendants' disclosures misleading to current and potential investors. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim") (emphasis in original).

The Complaint specifically alleges material facts that were omitted from the challenged statements: (i) the pre-determined secondary endpoints were measured using the "per day" analysis rather than the "per dose" analysis (¶¶13, 16; 62); (ii) only 74% of subjects were below Cmax 1500 ng/dL compared to the >85% target, and 14% of subjects were between Cmax 1800 and 2500 ng/dL compared to the <5% target (¶¶13, 16; 62); (iii) the FDA had never approved a comparable testosterone product that deviated so significantly from the pre-determined secondary endpoints (¶¶62-65); (iv) the FDA had rejected the suggestion that a protocol-violating subject should be removed from the data to allow for TLANDO to have met the "key" 2500 ng/dL limit secondary endpoint (¶¶48-50; 70); and (v) the fact that the DF Study met the secondary endpoints was

13

irrelevant to the FDA's consideration of the TLANDO NDA. ¶¶73, 77, 79, 81, 87, 91, 93.

The Complaint also explains why the challenged statements were materially misleading in light of the omissions. The Complaint describes how the quarterly and annual statements (¶¶75-76, 83-84, 89-90) created the false impression that (i) the pre-determined Cmax secondary endpoints were measured on a "per dose" basis, (ii) TLANDO's secondary endpoints were very close to the FDA target levels and thus comparable to other approved products, including Jatenzo; (iii) the DF Study meeting the secondary endpoints was material to the FDA's decision as to whether to approve TLANDO; (iv) Lipocine has adequately addressed the FDA's concerns about the secondary endpoints; and (v) the secondary endpoints were not a significant impediment to FDA approval. ¶¶61-70, 77, 87, 91. The Complaint further explains that the impression Defendants' disclosures created differed significantly from reality: (i) the pre-determined Cmax secondary endpoints were measured on a "per day" basis, even for drugs that required two doses per day like Jatenzo; (ii) TLANDO's secondary endpoints significantly missed the FDA target levels, and the FDA had never approved a drug that missed the endpoints so significantly; (iii) the DF Study meeting the secondary endpoints was immaterial to the FDA's decision as to whether to approve TLANDO; (iv) Lipocine had not adequately addressed the FDA's concerns about the secondary endpoints; and (v) the secondary endpoints were a significant impediment to FDA approval. *Id.*

The Complaint further alleges materiality by showing that the challenged statements misled the analysts who followed Lipocine. Following the November 2019 CRL, one analyst who was duped stated it was "likely that Lipocine will pursue a formal dispute resolution process with the FDA and make the case that Cmax characteristics for Tlando are consistent with" Jatenzo. ¶67. The analyst then posted a table comparing Jatenzo's Cmax to TLANDO's Cmax; the data cited

14

compared Jatenzo "per day" analysis to TLANDO's "per dose," despite the fact that Jatenzo's efficacy study used the same twice-daily dosing that the DV Study used. *Id.* Defendants successfully misled the analyst, just like investors, into comparing the "per dose" analysis of TLANDO with the "per day" analysis of Jatenzo. ¶¶67-68. Another analyst stated "given the approval of [Jatenzo] with Cmax excursions which were more profound than the TLANDO data, we believe LPCN has reasonable grounds to appeal the FDA's decision as the two products should be evaluated using consistent Cmax criteria." ¶68. He, too, had been misled. The FDA did evaluate TLANDO and Jatenzo using consistent Cmax criteria: the "per day" analysis. *Id.*

Accordingly, the Complaint adequately pleads that Defendants made materially misleading omissions because Investors "have identified various statements by defendants . . . , they have alleged specific facts that should have been disclosed, and they have explained in the complaint how the statements were misleading in light of the omissions." *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 871 (D. Kan. 2019).

The Motion makes several unconvincing arguments as to why the material omissions were not actionable. First, the Motion argues that Defendants had no duty to disclose any of the omitted facts because the briefing materials for the BRUDAC Meeting, which included the "per day" Cmax analyses, had been posted to the FDA's website in 2018.[7] Motion at 11-13, 17. This argument misstates black letter law that a duty to provide complete and non-misleading information arises once a company chooses to disclose material facts and has been thoroughly rejected in courts

---

[7] The Motion falsely argues that "[t]he fact that the trial did not meet the secondary endpoints became public knowledge in June 2017." Motion at 25 (citing ¶44). In fact, the June 2017 press release to which the Motion cites (Ex. I) falsely stated that TLANDO "generally met the pre-specified per dose secondary endpoints for twice daily oral administration."

across the country.[8] The fact that certain information may be publicly accessible elsewhere does

not shield Defendants from liability for their materially misleading statements and omissions.

*S.E.C. v. Universal Express, Inc.*, No. 04 CIV. 2322 (GEL), 2007 WL 2469452, at *7 (S.D.N.Y.

Aug. 31, 2007) ("That certain materially false company filings may be contradicted by publicly

available facts merely demonstrates the brazenness of defendants' mendacity; it does not absolve

defendants of their reporting requirements under federal securities law").[9]

Further, Defendants appear to be invoking a "truth on the market" defense, which posits "a

misrepresentation is immaterial if the information is already known to the market because the

misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154,

---

[8] *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 983 (8th Cir. 2012) (rejecting contention that statements "were not false or misleading because the Form 483s were publicly available through a [FOIA] request. Having chosen to represent it was in material compliance with FDA regulations and cGMP, KV was obligated to make a full disclosure of any material facts"); *Hou Liu v. Intercept Pharm., Inc.*, No. 17-CV-7371 (LAK), 2020 WL 1489831, at *6 (S.D.N.Y. Mar. 26, 2020) (rejecting defendants' argument that challenged statements about safety and tolerability were immaterial "because the FDA published the [Serious Adverse Events] reports in a public online database"); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128, at *14 (E.D. Pa. Mar. 25, 2020) (rejecting defendants' argument that omissions were immaterial because the truth was publicly available on the FDA website); *In re Amgen Inc. Sec. Litig.*, No. CV072536PSGPLAX, 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014) ("The mere fact that the FDA posted its briefing book on its website, or that the briefing book was made public, is not enough to shield Defendants from liability, at least at this early stage of the litigation"); *Wilkof v. Caraco Pharm. Labs., Ltd.*, No. 09-12830, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010) ("[t]his Court further declines to dismiss this matter based on Defendants' argument that documents such as the FDA Form 483s were public and could be accessed by shareholders").

[9] The holding in *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 547 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) is easily distinguishable. In Sanofi, the court held that defendants were not required to "reproduce a comprehensive enumeration of adverse events" each time they disclosed a single sentence about safety in their SEC filings and conference calls. *Id.* Here, in contrast, Defendants' filings included detailed descriptions of Cmax secondary endpoints that obligated disclosure of basic facts to not be misleading. Further, the *Sanofi* court held that defendants had good reason to believe the safety omissions were not material: unanimous approval from an FDA Advisory Committee approval in more than 30 countries, while TLANDO had been overwhelmingly rejected by BRUDAC. *Id.*

16

167 (2d Cir. 2000). To invoke this defense, a defendant bears the burden of proving that corrective information was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.* "The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.* Defendants do not even attempt to meet this heavy burden, and nothing in the current record even suggests that data buried on the FDA's website was a conveyed with the necessary degree of intensity and credibility sufficient to counter-balance Defendants' misstatements. Indeed, the fact that analysts were misled by Defendants' misstatements (¶¶66-69) and the price of Lipocine's stock crashed once it revealed the truth at the end Class Period (¶95) preclude a "truth on the market" finding at this stage.[10]

Second, the Motion argues Defendants had no duty to disclose TLANDO's "per day" Cmax results because it was "not an issue" during the Class Period. Motion at 13-14. Here, "[t]he Defendants are attempting to minimize the importance they themselves attached to the omitted information." *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1251 (D.N.M. 2013). During the Class Period, Defendants falsely stated that TLANDO "met key secondary endpoint" and had "other secondary endpoints generally consistent with approved products." Further, analysts were surprised by the November 2019 CRL because they believed Defendants' false statements about TLANDO having similar Cmax endpoints to Jatenzo. (¶¶66-69). Both Defendants and the market

---

[10] Despite Defendants' inappropriate "use of extrinsic documents to resolve competing theories against the complaint," (*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018)), the analyst reports upon which the Motion relies do not undermine the Complaint's well-pleaded facts, much less meet Defendants' heavy burden to prove "truth on the market" at this stage. *See In re Synergen, Inc. Sec. Litig.*, 863 F. Supp. 1409, 1421 (D. Colo. 1994) (where both parties introduce contradictory analyst reports about market knowledge, the court could not dismiss as a matter of law).

17

considered this information material, because it was.[11]

Third, the Motion argues that certain of the challenged statements are non-actionable because the Complaint fails to plead that Defendants did not honestly and reasonably believe their interpretations of the clinical data were accurate. Motion at 14-19. This is neither an accurate description of the challenged statements nor a correct summary of the law. Statements of opinion are actionable when they omit material facts "whose omission makes the opinion statement at issue misleading." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). The Complaint identifies the particular material facts that were omitted, the Motion concedes Defendants knew these omitted facts, and the Complaint explains why their omission rendered the statements misleading.

## B. Investors Adequately Allege Defendants' Scienter

The PSLRA requires plaintiffs to allege facts which give rise to a "strong inference" that the defendants acted with scienter. 15 U.S.C. § 78u-4(b)(2). In assessing scienter, the Court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.

In the Tenth Circuit, a "strong inference" of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was

---

[11] The Motion (at 16) argues that Lipocine's warnings that the FDA could reject the TLANDO make any certain alleged misstatements non-actionable, but statements regarding the unpredictability of the FDA approval process are common to all pharmaceutical companies and hardly meaningful in the face of undisclosed known risks to that process. *See Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005) (generic language like FDA "approval is never certain" is not meaningful and applies to "literally any issuer subject to FDA regulation").

false or misleading." *Adams*, 340 F.3d at 1105, *as amended on denial of reh'g* (Aug. 29, 2003). "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate." *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1297 (N.D. Okla. 2010), *on reconsideration in part* (July 30, 2010). "[T]o establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001). "The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Id.*

Investors plead a strong inference of scienter for Patel and Lipocine that is more compelling than Defendants' competing inference. First, the Complaint pleads in detail that Defendants "knew of or recklessly disregarded the falsity of the challenged statements *at the time* they made the statements." *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1309 (10th Cir. 2020). Indeed, the Motion ***concedes*** that Patel was fully aware of all of the alleged omitted material facts at the time the challenged statements were made. Motion at 21 ("it is clear" that "Patel knew the allegedly omitted details about the DV Study results"). Since certain of the alleged misstatements are not based on omissions, the Motion's concession of Patel's knowledge is a concession that he made knowingly false statements, which, alone, is a strong inference of scienter than Patel made knowingly false statements. *See S.E.C. v. Goldstone*, No. CIV. 12-0257 JB/GBW, 2015 WL

5138242, at *1 (D.N.M. Aug. 22, 2015) ("Defendants acted with scienter if they knew that their statements were false when they made them").

Second, Defendants were fully aware that omitting material facts would likely mislead Investors. Defendants' repeatedly chose to make affirmatively false and misleading claims to boost investor confidence in place of the omitted material facts. Defendants disclosed the "per dose" results and concealed the "per day" results because they wanted to mislead Investors into believing TLANDO was close to meeting the secondary endpoints. ¶63. Similarly, Defendants falsely stated that TLANDO's secondary endpoints were similar to those of other approved drugs because they wanted to mislead investors into believing TLANDO's failure to meet the secondary endpoints would not be an impediment to FDA approval. ¶¶9-10, 65-69.

1. Patel Was Intimately Involved in the Development and Attempted Approval of TLANDO and Was Fully Aware of Contradicting Internal Reports

Patel is not only the co-founder, CEO, and Chairman of Lipocine, he is also a co-inventor of TLANDO. ¶25 Patel presented much of Lipocine's case at the BRUDAC Meeting and regularly speaks at industry conferences about TLANDO. ¶¶25; 46; *See, e.g., Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1154 (D. Colo. 2019) (finding scienter where plaintiffs alleged executives were personally involved in "reporting of dialysis revenues, revenue per treatment, and other key metrics, and that they closely tracked the dialysis businesses financial metrics").

2. The Core Operation Theory Adds to Inference of Scienter

As of December 31, 2018, the Company had only 10 full time employees—only five of whom were engaged in drug development activities. ¶32. TLANDO is the only product candidate for which the Company has submitted an NDA to the FDA, and Lipocine was incurring more than

20

90% of its external research and development expenditures on TLANDO. *Id.*; *see Yellowdog Partners, LP*, 426 F. Supp. 3d at 875 ("The Court agrees with plaintiffs that the importance of this business does support an inference that defendants closely monitored the transition and its effects, and thus supports an inference of scienter here").

> 3. <u>Defendants' Prior Settlement of Securities Fraud Action Related to Previous TLANDO NDA Contributes to Inference of Scienter</u>

Following the FDA's rejection of Lipocine's first NDA for TLANDO in 2016, investors filed a putative securities class action lawsuit against Lipocine, Patel, and Lipocine's Chief Financial Officer, Morgan Brown. *In re Lipocine Inc. Securities Litig.*, Case No. 2:17-CV-00182 (D. Utah Mar. 14, 2017). ¶102. That lawsuit alleged that the defendants concealed material facts from investors about the proposed dosing of TLANDO, which misled investors about the risk of the FDA rejecting TLANDO. Defendants moved to dismiss the action on falsity and scienter grounds. Judge Benson denied defendants' motion to dismiss in its entirety, holding that investors had alleged a "plausible claim that the defendants withheld material information by way of omission."[12] Defendants agreed to settle the lawsuit for $4.4 million less than five months after their motion to dismiss was denied, and Judge Benson entered a Final Judgment approving the settlement and dismissing the action on July 9, 2018. *See* Ex. 2 to Kim Decl. The fact that Defendants settled a similar securities fraud lawsuit contributes to an inference of scienter because it suggests they were "more likely than not aware of the improper nature of the practice being alleged, or at least of the perception of the given problem, which puts it on notice and, is fair to say, generates a duty to inquire." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399

---

[12] The transcript of the October 24, 2017 Motion Hearing is attached as Exhibit 1 to the accompanying Declaration of Phillip Kim ("Kim Decl.").

21

F.3d 651, 685 (6th Cir. 2005) (citing the "*Helwig* factors" from *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)).

### 4. Defendants Had Motive to Commit Fraud

Patel had a clear motive to mislead investors: his Lipocine's continued viability depended upon it. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1234 (N.D. Okla. 2003) (finding "continued viability" a motive that for scienter); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (scienter pled where "[t]his is more than the usual concern by executives to improve financial results the executives' careers and the very survival of the company were on the line").

Lipocine has never generated revenue from product sales, had accumulated over $138 million in deficit, had to repay an onerous loan, and had a net loss of $11.7 million in 2018. ¶3. Indeed, Lipocine acknowledged in early 2019 that it "will need substantial additional capital in the future," and "[i]f additional capital is not available, we will have to delay, reduce or cease operations." ¶¶3, 121. The fraud allowed Lipocine to keep itself afloat by raising over $6 million from the sale of nearly 3 million shares of its common stock during the first quarter of 2019. ¶3.

The court's holding in *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1128 (D. Colo. 2017), based on a similar fact pattern, is instructive. Clovis was a pharmaceutical company run by its co-founder with no approved drugs or sales revenue that was dependent on capital from investors to fund its operations. *Id.* The plaintiffs alleged that Clovis made false and misleading statements and omissions about the safety and efficacy of its leading drug candidate to attract investor capital to fund its operating costs, and that Clovis would not have been able to continue operating without maintaining investor confidence. *Id.* The defendants argued that these were generalized motives shared by all businesses. *Id.* The court rejected the defendants' argument, holding that the motive allegations provided a compelling inference of scienter because they were

22

specific to Clovis: "no sales revenue," "only three drugs under development," "heavily dependent on investor capital," and the alleged misstatements were about its "most important drug." *Id.* The defendants then argued, like Defendants here, that the more compelling inference was that "Clovis genuinely believed it had designed and executed trials that would support approval of the drug." *Id.* For the purposes of weighing competing inference, the court assumed, *arguendo*, that Clovis's "competing inference could be drawn from the alleged facts, and even that it is a cogent inference," and still found plaintiffs' inferences of motive to be at least as compelling." *Id.* at 1129. The same result should hold here.[13]

5. The Inference of Scienter is At Least as Strong as the Competing Non-Culpable Inference

The Motion offers several purported non-culpable inferences, none of which are compelling individually or collectively.[14] First, the Motion falsely states that Patel ***purchased*** stock during the Class Period, which Defendants argue undermines any inference of scienter. Motion at 23 (emphasis

---

[13] The Motion's reliance on *Fleming* is misplaced. Motion at 22; *Fleming*, 264 F.3d at 1268 (noting that motive allegations "specifically and directly related to the underlying facts" can be probative). Further, the Motion's argument that Lipocine had previously intended to resubmit the TLANDO NDA does nothing to undermine Investors' motive allegation that Defendants prematurely rushed the resubmission process.

[14] The Motion's scienter section leads with the argument that Investors "must 'allege facts demonstrating that **Defendant knew its drug would not be approved**" to plead scienter. Motion at 20 (emphasis in original). This argument is based on a fundamental misreading of the caselaw. The plaintiffs in the case upon which the Motion relies were required make this showing because they alleged that the defendant "knew [the drug] could never be approved by the FDA." *In re Arrowhead Pharm., Inc. Sec. Litig.*, No. CV 16-08505 PSG-PJW, 2017 WL 8791111, at *6 (C.D. Cal. Dec. 21, 2017), *aff'd,* 782 F. App'x 572 (9th Cir. 2019). Investors in this action do not make any such allegation and need only plead facts supporting the allegations in this action: that "Defendants intentionally created a false impression that the Cmax secondary endpoints were not a significant impediment to the FDA's approval of TLANDO." *See In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) (plaintiffs "need not allege that defendants knew SONOMA–2 would fail; the SAC need merely allege that defendants misled investors by omitting to disclose a material *risk* that SONOMA–2 would fail..

23

in original) (citing Ex. H). As the Form 4 Defendants cite for the claim makes clear, Patel did not actually purchase any stock during the Class Period; he received an award of 10,000 shares. Individual stock purchases to not negate scienter. *See In re Advance Auto Parts, Inc., Sec. Litig.*, No. CV 18-212-RGA, 2020 WL 599543, at *9 (D. Del. Feb. 7, 2020) (there is no rule that stock purchases negate scienter, and performance-based awards may even add to inference of scienter ).

Second, the Motion conclusory asserts that "in light of the discussion regarding the non-applicability of the Cmax endpoints at the January 2018 BRUDAC Meeting, . . . [D]efendants honestly believed their descriptions of the data." Motion at 24. This suggested inference is implausible and unsupportable. The Motion cites re *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 555 (M.D.N.C. 2018) for this point, which found that a defendant likely believed its own disclosures to investors because it made the same disclosures and omissions in the FDA briefing documents. Here, Lipocine's 2018 briefing documents focused entirely on the "per day" analysis and never mentioned the "per dose" analysis, in stark contrast to Defendants' misstatements to investors throughout the Class Period. Finally, the Motion's suggestion that the BRUDAC Meeting and 2018 CRL motivated Defendants to conceal the "per day" data from investors is undermined by the fact that Defendants were also concealing this data from investors in 2017. *See* Ex. I.

### C. Investors Adequately Allege Loss Causation

To plead loss causation, a plaintiff need only allege a "short and plain statement" (*Dura Pharm. Inc., v. Broudo*, 544 U.S. 336, 346 (2005)) of a causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). Loss causation can be alleged through "a corrective disclosure" that "reveals the fraud to the public" or through "a theory of materialization of a concealed risk" in which "a plaintiff . . . show[s] that the defendant's misrepresentation concealed a risk that caused

a loss for the plaintiff when the risk materialized." *Kessman v. Myriad Genetics, Inc.*, No. 2:18-CV-00336-DAK, 2019 WL 1330363, at \*9 (D. Utah Mar. 25, 2019). Arguments over "loss causation" are "normally inappropriate to rule on . . . at the pleading stage." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

The Complaint alleges that "Defendants intentionally created a false impression that the Cmax secondary endpoints were not a significant impediment to the FDA's approval of TLANDO" (¶61) that inflated the price of Lipocine's securities (¶¶22-23, 107, 118-119), that the price of Lipocine's securities fell significantly upon the revelation that the FDA has rejected TLANDO because of its failure to meet the Cmax secondary endpoints (¶¶95-96), and that Investors thereby suffered losses (¶¶17, 22-23, 107, 118-119). These allegations are adequate at the motion to dismiss stage.

The Motion again raises a "truth on the market" argument that Investors failed to plead loss causation because certain documents were available on the FDA's website. Motion at 24-25. This argument fails for the same reasons that the "truth on the market" fails on materiality grounds: Defendants have not met their burden, and deciding a fact-heavy issue at the motion to dismiss stage is inappropriate.[15] Investors have adequately pleaded loss causation.

## IV.   CONCLUSION[16]

For the reasons set forth above, the Motion should be denied in its entirety.[17]

---

[15] *See Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008) ("most of Motorola's loss causation argument rests on establishing that the disclosures revealed information already known to the market, and thus could not have negatively affected the market. . . . [T]his remains a factual determination to be decided by the jury").

[16] Defendants contest Investors Section 20(a) claims only on the basis that the underlying Section 10(b) claim should be dismissed. Motion at 25 & n.22. Because those arguments fail, the Court should sustain Investors' claims under Section 20(a) of the Exchange Act.

[17] In the event the Court grants all or part of the Motion, Investors request an opportunity to replead. *See* Fed. R. Civ. P. 15(a)(2); *Jun Zhang v. LifeVantage Corp.*, No. 2:16-CV-965 TS, 2017 WL

DATED this 22nd day of September, 2020.

Respectfully submitted,

**JAMES DODGE RUSSELL & STEPHENS, P.C.**

*/s/ Mitchell Stephens*
Mitchell A. Stephens

*Liaison Counsel for Plaintiff and the Class*

Phillip Kim (*Pro Hac Vice*)
Daniel Tyre-Karp (*Pro Hac Vice*)
**THE ROSEN LAW FIRM, P.A.**

*Lead Counsel for Plaintiff and the Class*

---

2599883, at *11 (D. Utah June 15, 2017) (providing plaintiffs a period of time "to submit a formal motion to amend" before dismissing plaintiffs' claims without prejudice).

26