# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

CENTRAL DIVISION


In re:  LIPOCINE SECURITIES )

LITIGATION,                 )

_____)

DAVID LEWIS, individually   )

and on behalf of all others )

similarly situated,         )

          Plaintiffs,       )

vs.                         )     Case No. 2:17-CV-182DB

LIPOCINE, INC., et al.,     )

          Defendants.       )

_____)



BEFORE THE HONORABLE DEE BENSON

--------------------------------

October 24, 2017


Motion Hearing

A P P E A R A N C E S


For Plaintiffs:              TAMAR WEINRIB
                             600 Third Avenue
                             20th Floor
                             New York, New York

                             ZANE CHRISTENSEN
                             9980 South 300 West
                             Suite 200
                             Sandy, Utah



For Defendants:              DAVID KISTENBROKER
                             JONI JACOBSEN
                             35 West Wacker Drive
                             Suite 3400
                             Chicago, Illinois

                             MILO STEVEN MARSDEN
                             111 South Main Street
                             21st Floor
                             Salt Lake City, Utah



Court Reporter:              Ed Young
                             351 South West Temple
                             Room 3.302
                             Salt Lake City, Utah 84101-2180
                             801-328-3202

October 24, 2017                                        2:30 p.m.

P R O C E E D I N G S

THE COURT:  Good afternoon.

We'll go ahead in in re Lipocine, Inc. Securities Litigation.  This is 17-CV-182.  We're here on defendant's motion to dismiss.

Could I ask the attorneys to stand, please, and tell me who you are and whom you represent.

MR. MARSDEN:  Your Honor, Milo Steven Marsden from Dorsey & Whitney.  With me today are Joni Jacobsen and David Kistenbroker from Dechert, L.L.P., representing the defendants.

THE COURT:  Thank you.  And it is Kistenbroker, correct?

MR. KISTENBROKER:  Yes, Your Honor.

THE COURT:  Thank you.  And Ms. Jacobsen?

MS. JACOBSEN:  Yes.

THE COURT:  For the defendants.

And over here?

MS. WEINRIB:  Good afternoon, Your Honor.  Tamar Weinrib from Pomerantz, L.L.P. on behalf of plaintiffs.

MR. CHRISTENSEN:  -- Christensen from Christensen Young & Associates on behalf of the plaintiffs.

THE COURT:  Thank you, Mr. Christensen.

It is your motion, Mr. Kistenbroker, if you would like to go ahead.

I would like to finish by about a quarter to 4:00, if we could. So a little over an hour is what I have allocated for oral argument. I have read all of your briefing.

Please proceed.

MR. KISTENBROKER: Thank you very much, Your Honor.

THE COURT: Excuse me just one moment.

MR. KISTENBROKER: Sure.

THE COURT: Please proceed.

MR. KISTENBROKER: Thank you, Your Honor.

I am here on behalf of the defendants. Again, David Kistenbroker from Dechert.

It is the defendant's motion to dismiss, Your Honor. I know you have read the briefs, as you said, so I will move quickly and not belabor it and try not to repeat too much what is in the written materials. Obviously the Court is highly familiar with the standards that have to be met by a plaintiff at the pleading stage on a motion to dismiss in a shareholder class action. 9(b) comes to bear and the P.S.L.R.A. comes to bear.

This Circuit Court has articulated three proscriptions, as they refer to them in the Tenth Circuit

case law, that are also the overlay that must be considered on a motion to dismiss, particularly in a scienter case.

One is that their allegations need to be taken as true as pled, but the Court is not obligated to take the legal conclusions as true.  The plaintiff has to also meet particularity, bringing forth facts with particularity in a scienter situation such as we are found with today.

The Court will look at their complaint holistically and in its totality, and it is inherently a comparative situation when considering the various inferences that may or may not be raised by their pleadings.

Under the Tenth Circuit law, the Zagg case and Fleming, there is a two-part test when scienter is being challenged by the defense that has to be met.  That two-part test is, first of all, that the material fact has to be known to the defense, that that can be gleaned from the averments of fact in the complaint, and, secondarily, that the defendants knew that a failure to reveal that material fact would be misleading to investors.  It is a two-part test that the Tenth Circuit has set forth.

It should be stated also that the plaintiff in this kind of circumstance does get the benefit of trying to demonstrate intent by recklessness as well, and the Tenth Circuit has spoken to the recklessness road map, if you will, and said that courts are very cautious to ascribe

liability on a recklessness basis, and that recklessness itself is a very high bar, just like intent, and they have described it in various terms as much higher than negligence or gross negligence.

Let's look at the plaintiffs' complaint and look at the allegations that they have set forth. In paragraphs three and 38 of the complaint they quote right from the complete response letter that Lipocine received from the F.D.A. That says specifically that the proposed titration scheme for clinical practice was significantly different from the titration scheme used in the phase three trial, leading to discordance in titration decisions between the phase three trial and real-world clinical practice.

Variously in the complaint in other paragraphs, such as paragraph 16, they again are complaining about the fact that the titration scheme in phase three and in the N.D.A., which was the clinical use, was different. They complain in paragraph 21 that the corporation failed to disclose, and they would argue that the company had a duty to disclose that the titration system was different in the phase three study as utilized by the company, and what the company proffered in the N.D.A. to the F.D.A.

There are several other paragraphs, and essentially I believe in their briefs they basically argue that this is a bait and switch problem. That is the

gravamen of what they indicate.  So in looking at the two-part test in the Tenth Circuit, I would suggest that the most that the Court could infer in looking at this complaint from the allegations set forth is that perhaps the defendants, the individual defendants knew that the titration system was different in the phase three trial than what was submitted by their company in the N.D.A. to the F.D.A.  I think that would be a fair inference to draw from the allegations.

However, part one of the test in this particular case that they have brought would require that the defendants not just know that that titration system was different, but they would have to know that that would cause a significant risk that the F.D.A. would reject the N.D.A. because of that difference.

And then part two of the test would be that they would have to demonstrate through specific particularized facts that the defendants had an intent, by making that difference and not telling, to deceive the investors.  I would suggest to the Court that there is nothing in this complaint that speaks to part two of that test at all.  I think a great way to examine that, and what is often used by plaintiffs in these cases, are so-called confidential witnesses, of which they are set forth in the complaint at paragraphs 17, 18 and 19.

The most that these confidential witnesses can say that relates to the two-part test in the Tenth Circuit is that the individual defendants monitored the results and the individual defendants were very involved in the phase three testing.

THE COURT:  Why did your clients change the titration scheme that it put in its application to the Federal Drug Administration in the N.D.A.?  Why did it change it from the one it claimed was safe and efficacious during the phase three criminal trial?

MR. KISTENBROKER:  Well, remember, they did it just as the Axiron people in Exhibit H did, that we have asked the Court to take judicial notice of, and there was one titration system in their phase three --

THE COURT:  Well, tell me why your client did it. First tell me why they did it.  I need to understand that. It does not make any sense to me why a company would tout their product as alleged, and they claim they touted it to would-be investors because it had been tested and subjected to a significant phase three clinical trial with dosages and titrations and all that that entails to figure out that this thing does not have bad side effects --

MR. KISTENBROKER:  Yes.

THE COURT:  -- and that it is safe to use and that it is effective --

MR. KISTENBROKER:  Yes.

THE COURT:  -- to treat the condition it is supposed to treat.  Why would you tout that to would-be investors and then change the product and the way that it is used when you're seeking approval to go out and sell the thing?  That has never made any sense to me in all the reading I have done in this briefing.

Explain that to me.

MR. KISTENBROKER:  Understood.

It is what was changed that is causing the Court I think the difficulty.

THE COURT:  Don't tell me it is causing me difficulty.  Just answer my question.

MR. KISTENBROKER:  Okay.  The titration --

THE COURT:  If you can.

MR. KISTENBROKER:  I can try.

THE COURT:  You didn't in your reply brief.

MR. KISTENBROKER:  I am going to try.

THE COURT:  I thought I am going to get an answer in the reply brief that explains this F.D.A. process and why this would be touted one way and people invest in it, and then it is pitched to the F.D.A. for approval in a different way.  That seems to be what they are saying.

MR. KISTENBROKER:  I think that is what they are saying.

THE COURT:  Okay.

MR. KISTENBROKER:  A bait and switch.

The efficacy and safety relate to the drug and the dosage, not how you figure out how much to give a patient of the drug.  The titration system is different than the dosages of the medication.

THE COURT:  I know.  You say that in your brief, but I don't think I understand that yet.

MR. KISTENBROKER:  Okay.  In the phase three study you can have a patient in your clinic for 24 hours and draw blood 15 times to check testosterone levels.  You can't do that in the real world, but in a study you can and they did.  They said publicly that they did it in week three and week seven.

They can have a patient, because it is a study, who agrees to do this in the clinic and draw blood as many times during the day as they want to make sure, titrating, that the drug dosages -- check the serum levels throughout the day on that patient.  In the real clinical world the doctors, as in Axiron and as in our company, don't get that benefit.  They can't have a patient in their office for 24 hours doing perhaps 15 blood draws to make sure that the dosage is correct.

So what these companies have to do is they do this deep dive and have the exposure of the client in their

clinic, the patient in their clinic for as many hours as it takes to get the study done right, and then they have to extrapolate in the real world what will a doctor be able to do with your eye if we come in with this particular issue for assessment?

They can take a blood draw, but they can't do 15 a day and have you there 24 hours eating meals that are ascribed in the phase three study, such that it does not affect the serum blood levels of testosterone.  So they have to come up with a mechanism that they can submit to the government and the N.D.A. that says, okay, you have the phase three study.

This is what the doctors can do out in the field with real patients, and for the statistical reasons we are putting through in the N.D.A. to you, F.D.A., you will be able to see that this doctor, drawing blood at this time with his patient, will be able to be as confident as the clinical study where we could do the 15 blood draws per day of a 24-hour day with that patient in our clinic, where we had control over them, to make sure that the real-world safety and efficacy of that dosage, the dosage of the drug, determined differently by only one blood draw in the real world, because that is really all you get, versus 15 blood draws in 24 hours in the test because you can't do that in the real world.  That is what they do and that is why we

gave you the Axiron case.

I want to speak to why that is available.  It is approved.  The F.D.A. is prohibited by the C.F.R., that we cite the Court to, from publishing pending yet unapproved N.D.A.s, because everybody would know how the secret sauce is made.  The secret sauce is the titration system.

I would submit to the Court, now that I have made that dichotomy and explained that, that the reason there is no duty to disclose here is that the company never, ever once in any speaking or publishing of S.E.C. filings told anyone in phase three what that titration system was.  Highly proprietary.  Highly proprietary.  Because if we did, the other drug companies that we're competing with would see how we are doing that and would say that is how Lipocine is figuring out the dosages.  That is how they are doing it.

We don't want them to know that, just as Axiron, before they were approved, didn't let anybody know.  After it was approved, the government -- the F.D.A. posted it on the website, dot gov, and you could see what the company had done in the study versus the single blood draw that you read in that posting after they were approved.  The only thing that the company ever did was they told people all throughout phase three, in S.E.C. filings, in verbal statements, what the dosage ranges were.  That was just fine.  We didn't care if anybody knew what the dosing ranges

were.

How you determine for each person -- each person, you, I -- the right dose for us is through the magic of titration and figuring out for you and for me what is the right dosage so that I am at the right serum levels in my blood, that it has efficacy and safety, that drug agent which was shown to be effective and safe.

THE COURT: Then why did the N.D.A. get rejected?

MR. KISTENBROKER: The complete response letter was what I quoted, Your Honor, and it said it led to -- the difference in the titration systems led to what is called by the F.D.A. and by the scientists discordance in titration decisions. I will tell you what that means when they write that.

In phase three, using that very elaborate multiple blood draws a day on a patient, watching what they eat process, we got to in phase three a level of being very confident, where if there were 100 people in that study, we knew that we would have, you know, 88 or 85 or whatever spot-on with the dosages that they need for their blood level. In fact, the company stated publicly that over half of the patients in phase three who started on a dose, that was their right dose from the get-go. 51 percent, they actually hit on that.

It is this discordance and what the government is

saying is that they rejected the N.D.A. because the system that the company algorithmically and statistically extrapolated to, of what could be done in the real world by a real doctor with a real patient taking one blood draw, didn't quite get all of those same 100 patients, not quite all of that right dose.  There were a few that might have been getting not the proper dose, and they wanted the company to go back to the drawing board and get a better extrapolation on how to get it done in the real world properly where you get one shot, one blood draw basically, and that is why they rejected it and they sent the company back to the drawing board on it.

They said it didn't quite match up result per patient as well as it did in phase three, because how the doctor clinically over here, who was limited to maybe one blood draw, how that one blood draw affects the dosage depends on the time of day that doctor in the field might take that blood draw, and it depends on what type of food that patient's diet consists of, and the extrapolation didn't quite get it up to the right level.  It was very close.

THE COURT:  What is the next step?  Help me out with that.

MR. KISTENBROKER:  Well, they are involved in it right now.

THE COURT:  Is there a phase four?

MR. KISTENBROKER:  There is a different study going on right now, which the company has spoken to this issue, and they are doing a single dose, no titrating at all.  They are attempting the single dose where they try to get the magic amount up front on the one shot.

Do you remember I said they got more than half, and they noticed statistically, even though they were titrating the right dosages per patient, they noticed that on 51 percent they actually nailed the right dose the first time and never had to alter it?

That is the approach they are taking now full-on.

THE COURT:  Tell me if I am misunderstanding this. These investors are given a lot of information about how well the company was doing in their view to show that this was a safe and effective drug by their phase one, phase two and phase three clinical trials.

MR. KISTENBROKER:  Yes.

THE COURT:  That is what the investor knows about. Are you telling me that an educated investor in this field would know there is some proprietary information that pertains to titration in the real world, in the real clinical world that we are just not going to know about now, because that would be foolish to tell it to us now because it is telling it to the whole world --

MR. KISTENBROKER:  Well --

THE COURT:  -- or something like that?  What am I missing on that?  Is that your argument?

MR. KISTENBROKER:  Well, the argument is that what is being done -- some of the things these drug companies all do is proprietary, and that is why the government is prohibiting from posting the N.D.A. on the web when it is not approved, when it is pending.  There is secret stuff in there.

THE COURT:  I am just trying to see what you legitimately in this area would be expected for good reason to keep from the would-be investor.

MR. KISTENBROKER:  I think the reason lies -- and it is a trade secret, just as it would be for our competitors who don't tell how they're selecting the dose, and that is the secret.

THE COURT:  What the plaintiffs seem to want to say is, look, we were told that this thing was safe and effective and that dosages were given and there was the titration scheme that was experimented with and done, and you are saying 15 times a day with people that they had access to --

MR. KISTENBROKER:  Yes.

THE COURT:  -- 15 times a day, but that these investors should have known, if they were sophisticated

investors or knowledgeable people, about the way the F.D.A. approval process goes, that the company is not telling us everything about the titration system that they are going to be giving to the F.D.A. people when they seek final approval of this new drug application?

MR. KISTENBROKER:  Well, there are a lot of things that are interesting about that question because, first of all, you would have to get your phase three completed and be working on your N.D.A. before you could do the statistical number crunching to figure out what the titration approach will be by that doctor, which really means what time of day is he going to draw the blood for the one shot that he gets on the patient to match the things that you could do clinically with 15 blood draws.

That is a process by which any drug company would have to go through, and the drug companies don't publish how they are selecting the dosage for their patients, because then all their competitors would know how they are doing it and they were quite successful.  I don't think the government had any problem with the safety or efficacy of the dosages of the testosterone, except for on any individual patient how that dose was selected through this statistical model that showed that if doctors did it the way that a company recommended in the N.D.A., it would approximate the results of what was done in phase three in

selecting the dose where you have the patient in your clinic for full days at a time, 24-hour cycles, which you can't do in the real world.  So you have to figure out how this wonderful agent that is safe and effective can be dosed in the real world by a doctor down the street that you might go visit.

THE COURT:  Why couldn't, in the final phase three study, why couldn't you better approximate the real world so that what you pitched to the F.D.A. you have already experimented with in your clinical trial?

MR. KISTENBROKER:  I think the answer is -- and I admit I am speculating, but I am with you on this.  I think the answer is that the most robust process that you can do as a company in proving the safety and efficacy, which means all of these massive blood draws in a day, and you have wild access to the patient and they are not leaving your clinic, they are there for a long period of time, and you can really pinpoint and put your proof in that we know we have got this.  But we also know and everybody knows that a doctor can't do that to a patient in the real world.

THE COURT:  My question is why not more approximate the real world then in your phase three clinical study or your final one before you go seek an N.D.A.?

MR. KISTENBROKER:  I guess I would leave that to the scientists.  I really don't know the answer to that and

whether that is possible.  I will say that I think when it comes to the securities laws it is whether there is a duty that you have to say it or not.

As I said, we never once told anyone what the titration system was in phase three.  The investors didn't know.  The government didn't know until we gave it to them later.  Nobody knew.  We never spoke.  We were silent and silence is just fine under the federal securities laws, unless we said something that was made misleading because we didn't speak, and they cannot point to one statement of this company that was misleading because we didn't tell what the titration system was.  They don't know what the titration system was in the phase three study and they also don't know what it was in the N.D.A. study.  They have no idea because we never said a word about it, so they were not misled actively and there was nothing by omission that the company was obligated to say.

Again, I will say that the federal C.F.R.s that we cited say why we don't have to say all of that because the government knows that it can't even publish the N.D.A. because of the proprietary nature of those things, but the focus of the security law is no duty to speak unless we spoke a half-truth, which they can't point to because we didn't say anything about it.  I hope that is helpful.

THE COURT:  All right.  Let me hear from Ms.

Weinrib and then I will hear your response to her.

Please.

MS. WEINRIB:  Thank you, Your Honor.  Again, I am Tamar Weinrib from Pomerantz, L.L.P., on behalf of plaintiffs.

I have a whole presentation here, but I think what might be more helpful is if I address some of the points that you raised with defense counsel, as those seem to be the focus of the Court.

What I would like to lead with is what the defendants ended with, which is that there was silence and because there was silence, there was no duty to disclose.  I think a differentiation needs to be made between speaking on a subject like the titration scheme generally and speaking about the secret sauce portion, the details.

Now, there is no question if you go through the complaint and you go through the identified misstatements, that the topic of titration came up repeatedly.  For example, we start off the class period with a press release. That press release says all subjects randomized, L.P.C.N., 1020, were started at 225 M.G. testosterone, and I am not going to try and pronounce the next word, twice daily and then dose titrated, if needed, up to 300 M.G. or down to 150 M.G.  Dose titration decisions were based on serum testosterone levels measured during weeks three and seven.

So they discussed the titration scheme.

Again, they talked about it in their 10-Q a couple of months later. They talked about the titration scheme along with the information that was gleaned regarding C.F.T. efficacy, and clearly those two are related, and if a person takes an Advil and their headache does not go away, the label says go ahead and take another one. That is gradually changing the dose of something until it works.

THE COURT: Is that what you understand titration to mean --

MS. WEINRIB: My understanding of titration --

THE COURT: -- adjusting the dose?

MS. WEINRIB: My understanding of titration, and this was also the same way that the defendants explained it in their briefing, is that it is the process of gradually adjusting a dose until optimal results are achieved. That is the definition. You have to know how to adjust that dose to a point where it is going to work but still be safe. Just common sense says the issue of titration is linked to the issue of safety and efficacy. You can't separate the two.

Back to the statements that were given during the class period, like I said, you also have that 10-Q, and you have the press release announcing the submission of the N.D.A., which says that the content of the N.D.A., the

submission was supported by the phase three data. It does not mention that there was this switch in the scheme, and that the data does not actually support the new scheme, it supported what was tested. That press release discussed titration generally also.

You have a meet conference where Defendant Patel spoke and he focuses on titration. He actually uses it as a differentiator between L.P.C. and 1021 and competitors and says we're in a much better space as far as approval goes. Other companies have had difficulties with approval. He says our starting dose is the right dose for most patients. Why is that important? In his words, most men don't like to go back to the doctor's office to get their dose adjusted. That is the concept of titration. So the majority of men can be assured that they may not have to go back two or three times to get their dose adjusted. It is a better product. That is the quote.

So they focus on this not only in describing the wonderful results of the phase three trial, but also as a competitive advantage over other products, so clearly the subject came up.

What they never disclosed and wherein the issue lies is that they changed that titration scheme, and not just changed it, but according to the C.R.L., the complete response letter, changed it significantly when they

submitted the N.D.A. and they never disclosed that.

That is important for a number of reasons.  It is important because this is a company that is a one-trick pony.  It does not have any other products approved on the market.  This was their product.  This was the one that investors had their hopes on.  So anything that raises a risk, however slight or significant, about the approvability of that product would be something that investors should know.  This is not a situation where you have G.E. or Johnson & Johnson where there are numerous other products contributing to the bottom line.  There was one product here.

Again, going back to the defendants' argument that this was proprietary information, they can't disclose this, but what they disclosed is that there was a titration scheme, and whatever information they gave about that scheme, it raised a duty to say that the scheme changed.  I am not saying they have to give all of the proprietary details of that, but the fact of the change is what they should have disclosed.

Going to the scienter issue and the proper standard, and the defendants led off with that, so I will go back to that, and that was the focus, the main focus of their argument, unless Your Honor has any questions about the misleading statement element.

THE COURT:  I will ask a question if I have one.

MS. WEINRIB:  Okay.  Fair enough.

The defendants spoke about the standard for scienter and they mentioned Your Honor's decision in Zagg, and they also mentioned the Tenth Circuit's decision in Fleming, and the defendant concedes that there are two ways to do this.  There is recklessness or there is intentional conduct.  The two prongs that the defendants identify are on the intentional conduct portion of things.

The first prong, if you're going that route, and in accordance with Your Honor's decision, is that the defendant knew of a material fact.  The defendants in their presentation today concede that they knew of the material fact, which is that the scheme changed.  So prong two is met immediately.  Sorry.  Prong one is met immediately.

Prong two is that they knew that their failure to reveal that fact would likely mislead investors.  So there is no question here that the defendants had awareness of the subject matter of their misleading statements, and there is no question that they also had contemporaneous knowledge that the scheme they tested and spoke about to investors during the class period was not the scheme that they planned to use in real-world practice and submitted to the F.D.A.

The question then becomes what was their obligation?  This is not a case where we're alleging that

the defendants had to disclose a certainty of F.D.A. rejection.  That is not the allegation here.  The allegation is that they knew there was a risk, and they don't deny they knew there was a risk to the application, and that they didn't disclose that risk to investors.

This is a small company, 17 to 25 employees during the class period.  Half of those were involved in the development of the drug.  I can go on and on giving you reasons why it is obvious the defendants knew, but the defendants are not disputing that so I will move on.

When it comes to the C.W.s, the purpose of the C.W.s was simply to establish the defendants' involvement. Again, that is not disputed so I will move on from that as well.

One other point that I will touch on, unless Your Honor has additional questions about the facts as the plaintiffs have alleged them, and one item that didn't come up during the presentation today was the issue of risk disclosures, and just reiterating what is already in the papers, the risk disclosures do nothing to exculpate defendants here because they were generic and they were the kinds of disclosures you would find in any pharmaceutical company's S.E.C. filings, which is that the F.D.A. might not approve this, they might not agree with our view on things, but nothing that alerted investors to the specific risk

known at the time, which is that this change in titration scheme placed the N.D.A. at risk.

Again, that risk materialized when the C.R.L. came out.  The C.R.L. made it very clear that the reason for the rejection was a change in the titration scheme, because it differed significantly from what was tested.  Your Honor made an excellent point.  Why not just test the drug the way it is going to be used in the real world?  What is the point of testing a drug in phase three in a way that is not going to be used in a real-world situation?  The whole purpose of the new drug application is to convince the F.D.A. that when a patient takes this drug, it will be safe and efficacious in the real world, not in a lab where their blood is tested 15 times a day, but real world.

In fact, the issues were so bad, at least the inferences of the issues were so bad in the post class period that the company did undertake new clinical trials that are fixed dose clinical trials.  They don't deal with titration at all.  The F.D.A. said your new titration scheme does not work.  You switched it from the old one.  Titration is not in the mix anymore at all.

Now they have to prove that the starting dose is the dose that works.  So the overall inference here of scienter is very strong.  It is definitely more compelling than any competing inference.

With that, Your Honor --

THE COURT:  Explain to me the way you understand the difference between dosage and titration.

MS. WEINRIB:  So my understanding -- again, I'm not a scientist nor an expert in the pharmaceutical industry, but based on the way that it was described in the S.E.C. filings and in the defendants' papers and just based on my own lay understanding, a dose is what the company decides is that amount that you take to have the drug work and be safe.

Titration is if it does not work that first time, we're going to gradually adjust that starting dose until we achieve optimum results, until it is working for you.

THE COURT:  Is it just adjusting the dosage?

MS. WEINRIB:  Correct.

THE COURT:  Is it your contention, the plaintiffs' contention that when the company issued these press releases that you have referred to, and the comments that it made at the annual health care conference and so on, that at that time that they knew that they were going to be putting forward a different titration scheme in seeking approval of their N.D.A. from the F.D.A. than the one they had used in phase three?

MS. WEINRIB:  Yes.  My reason for saying that is twofold.

One, the N.D.A. was submitted soon after the start of the class period. This is not an instance where the class period begins on day one and the N.D.A. is submitted a year later. It was submitted within the next couple of months. What we know for sure also is when the class period began, the phase three trial data had already been analyzed and gone through per their own statements, and if there was an issue with the titration scheme, they would have known that already and had already made the decision that this is not how we are going to submit this to the F.D.A.

THE COURT: Mr. Kistenbroker will no doubt correct me, as I'm about to misstate his argument, but as I understood it, it went something like this, that when they dealt with the F.D.A. they revealed a different titration scheme than the one that had been used, to the extent titration was used in phase three, because the real world of dealing with people one at a time and whatnot and not being able to stick them with a needle 15 times a day was different than the phase three trial.

I think we understood that the same way?

MS. WEINRIB: No.

THE COURT: Okay.

MS. WEINRIB: With all due respect, I understood that differently. The facts suggest that the conversation with the F.D.A. took place pre phase three. There was a

conversation with the F.D.A. during which they agreed upon trial protocols and how things would be tested and that included titration, and so the titration scheme that was used during phase three was discussed with the F.D.A. and agreed upon beforehand.

What I understood Mr. Kistenbroker to be arguing for the first time today, and this is not in the papers, is that because there are all these significant blood draws and all these intricacies that go into testing the blood during phase three that can't be mimicked in the real world, that the company made the decision that we're going to change this and make it more amenable to real-world practice.

THE COURT:  Because that will get us approved, because the F.D.A. wants it to be approved in the real world.  That is argument, anyway.

MS. WEINRIB:  I don't think that is a reasonable inference given their prior conversations with the F.D.A. and the agreement that the titration scheme would be tested one way.  The point of a phase three trial is to prove to the F.D.A. that when this is used in clinical real-world practice, it will be safe and efficacious.  It is just illogical to suggest --

THE COURT:  Well, that is what I started out with Mr. Kistenbroker --

MS. WEINRIB:  I agree with you.

THE COURT:  -- and he managed to at least confuse me, thinking that really I need to know more about how both the F.D.A. process works and how important it is for a company not to disclose too much even to its would-be investors too early because the whole world would know, and he seems to say, or in his brief he does say this and today, that titration is different than dosage.  If you and I are right, they are certainly related.

MS. WEINRIB:  Exactly.

I think that is the point, Your Honor.  They are inextricably intertwined.  If you're a company that is putting a drug up for approval and as part of that you are introducing a titration scheme -- not every company does that.  Not every drug has a titration scheme, but theirs did, and to the extent that titration is introduced into the mix it is inextricably intertwined with dosing.

In touting the results here today, he said that 51 percent were good after the first dose, but that means that 49 --

THE COURT:  In the phase three trial.

MS. WEINRIB:  In phase three.  That means that 49 percent had to be dose titrated.  So this was extremely relevant, and it was an integral part of the N.D.A., and the fact that it was integral is evidenced by the C.R.L. and that was the reason it was rejected.  This wasn't a small,

insignificant matter.

To try to take some of the confusion out of the equation, I think common sense has to come into play here. The whole point of a phase three trial, as I mentioned earlier, is to convince the F.D.A. that this is safe and efficacious for real-world use. There would be no point in conducting a phase three trial if what was tested and the way it was tested had no application in the real world.

Going back again to what they had to disclose about titration and there being a secret sauce and proprietary information, we are not suggesting they had to disclose proprietary information. We are suggesting that they spoke about the titration scheme and gave whatever details about that scheme that they gave, in conjunction with talking about safety and efficacy, and never disclosed that the scheme was changed. It is as simple as that. That does not disclose anything proprietary. It simply discloses that the scheme that we tested and that we're touting changed.

THE COURT: Or they already knew that it would be presented differently to the F.D.A.?

MS. WEINRIB: They didn't know that. How would they know that? The defendants never disclosed that.

THE COURT: No. That the defendants knew. I asked you this earlier, that the defendants knew that the

sale they were going to try to make to the F.D.A. was different than their phase three titration scheme?

MS. WEINRIB:  Yes.

THE COURT:  That is the essence of your case?

MS. WEINRIB:  Correct.

THE COURT:  You boil it simply down to, look, our clients, the plaintiffs, believed that the company, when they said our phase three titration system shows that this product is safe and efficacious and does not have adverse side effects --

MS. WEINRIB:  Yes.

THE COURT:  -- and the investor hearing that would think, all right, then that is what is going to be pitched to the F.D.A., and they are likely to also agree if this phase three study that went on for a year or two showed all of that, that the F.D.A. will grant the N.D.A.

MS. WEINRIB:  Correct.

Let's not solely base that on assumptions.  Let's look at the defendants' own words during the class period. When they announced the submission of the N.D.A., they say that their submission is based on the phase three trial data, but an integral part of that wasn't.  They put a new titration scheme that was not tested in there.  That in and of itself is false and, you know, shows that what investors understood and what was reality was different.

THE COURT: Well, your argument is much simpler, plainer and easier to understand than his. I want to hear what he has to say now --

MS. WEINRIB: Fair.

THE COURT: -- because he did manage to have me leaning his way, because I thought there was a whole lot that I didn't understand about this system, and that there was usually a holdback or something and that a savvy investor or even anybody who was using common sense would say, well, we don't know everything yet.

Let me hear from him and then I will see what we do from there.

MS. WEINRIB: Thank you, Your Honor.

THE COURT: Sir, please. I need a little more education from you because I'm now confused. Her argument is simpler. Yours is more complicated, so help me out.

MR. KISTENBROKER: Well, and I will try and focus on the securities laws as I do it, Your Honor.

The first thing I would like to say is I would like to challenge something the Court said in talking with counsel. I believe you said in trying to understand her argument that the titration system showed that it was safe and effective. Nothing could be further from the truth.

THE COURT: You didn't say that?

MR. KISTENBROKER: The titration system didn't

show anything to do with safety and efficiency.  What the phase three trial showed was that this testosterone in the doses we said to the public in our filings and in our verbal statements were safe and effective.  All the titration system is is if John Smith is in the clinical phase three trial, it is the process that the physicians running the test used to determine how much of that testosterone John Smith, not me, John Smith individually needed.

THE COURT:  And that information will cause his dosage to be adjusted upward or downward?

MR. KISTENBROKER:  It could or it might prove that he is spot-on.  We don't know, but in this hypothetical it could be any of the three.

THE COURT:  All titration is is an effort to adjust -- if two Tylenol does not get rid of your headache, then take three for that guy.  Maybe he is some bigger guy.

MR. KISTENBROKER:  Exactly.

THE COURT:  Right.  That is what she seems to say and that seems to make sense to me.

MR. KISTENBROKER:  But the system of titrating and determining the dosage for any patient is not what is safe and effective.  It is testosterone in a stated dose as determined for you that the phase three study proved is safe and effective.

Think about these inferences.  Would the company

self-sabotage itself?  I would say that that would be a bizarre inference to draw from the complaint.  The wishes of the investing public, the plaintiffs, and the company at the time of the N.D.A. submission are the same.  We all want it approved.  Would the company sabotage itself and say I know if I put in a different titration system I am at great risk of them saying no?

Or is it more plausible, which is what the securities laws and cases require us to draw a more plausible inference, which is that the scientists who ran prase three and had great results were honestly trying to figure out what the doctor can do in the real world, and they crunch the numbers on what time of day to take the blood test and get that in to the N.D.A. and to the government and get it approved or were they trying to self-sabotage?  Their theory makes no sense.

THE COURT:  Well, that sounds like a good jury argument, but that is a question in this case.  Why would they switch?  Why wouldn't they tell the investors that we're going to use a different titration scheme?

They say this, and let's just look at the June 29th, 2015 press release touting the safety and efficacy results of the phase three trial, and they quote it as saying all subjects randomized to this product were started at a certain milligram dose.

Fair enough?

MR. KISTENBROKER:  Correct.

THE COURT:  Twice daily.  Then dose titrated, and I never heard that word before I got into this case, dose titrated.  That is in your client's press release.

MR. KISTENBROKER:  Yes, sir.

THE COURT:  And if needed, so that is an adjustment to the dose, up to 300 milligrams or down to 150 milligrams.  Dose titration, and there is that word again, decisions were based on serum testosterone levels measured during weeks three and seven.  Their simple claim is that that release was false and misleading because it failed to disclose that this pitch that was being made to the would-be investors -- and you know this, and I am just wasting words probably here, but that that was not the full truth, because at that point in time the company already knew that the titration scheme that it was going to be presenting to the F.D.A. to try to get this thing approved was different from that.

MR. KISTENBROKER:  That statement on its face, Your Honor, is true.  We never told anyone, and we said the word titration I bet 100 times in our releases, at least, maybe 200, and --

THE COURT:  Finish that.  You never told anyone, and I think you told me this before, what it was.

MR. KISTENBROKER:  What it was.

THE COURT:  It seems like they have a point that that could be misleading.  Why didn't you?  Why didn't you say the simple words, by the way, all of this stuff we're talking about how safe and effective the testing showed this product was during phase three, that is not what we're going to be trying to sell to the F.D.A., because the real world is different than this little fake world we invented to test safety and efficacy?

You say it does not make any sense that you would self-sabotage, and it does not make any sense to me as your opponent said, and I am going to get her name wrong, Ms. Weinrib, and it does not make any sense to me or to her, apparently, why you would go to all of that time and effort in phase three to prove safety and efficacy and that not be the test or the results that you were going to show to the F.D.A.?

MR. KISTENBROKER:  Indeed.  Why would you spend the millions?  I will tell you why any drug company does. The rigors of a phase three trial are a heavy burden on a company.

THE COURT:  Well, then you better do it to mimic the real world, because that is where it is going to be sold.

MR. KISTENBROKER:  You have to do it right on the

medication or you'll be in deep trouble.  They got it right.
So what they did in the N.D.A. was say, okay, we realize a
doctor can't test serum levels 15 times on John Smith two
days in a row in the clinic because he is not going to bring
a cot in and stay there for 48 hours.  What will his doctor
be able to do with him?

THE COURT:  Why not tell the investors that?  When
we go to sell this product that you're investing in, we're
going to have to tell them, look, what we did for all of
that time and money during phase three lasted a year or two,
but forget about it, because we can't mimic the real world
and so we're going to wing it apparently.  I don't know what
else it would be based on.

MR. KISTENBROKER:  I hope they didn't wing it.

THE COURT:  What did they do?

MR. KISTENBROKER:  I understand.

THE COURT:  If they weren't winging it, it wasn't
based on anything they had done.  Help me with that one.

MR. KISTENBROKER:  I will.

THE COURT:  Okay.

MR. KISTENBROKER:  If the company had told the
world and the investors what they were doing to select and
get to the right dose for every patient --

THE COURT:  In phase three?

MR. KISTENBROKER:  In phase three.

THE COURT:  Okay.  All they had --

MR. KISTENBROKER:  They could have chosen to do it, to --

THE COURT:  To do what?

MR. KISTENBROKER:  To tell the world and the investors that we are drawing blood 15 times a day for two straight days in week three and --

THE COURT:  Well, they gave them quite a bit of information.

MR. KISTENBROKER:  But they never told them that. You and I wouldn't know how they did it.

THE COURT:  Fair enough.

I think if I was going to be an investor I would have assumed that that study that showed safe and effective would be the basis for the proposal or for the application to the F.D.A.  So what did they try to sell to the F.D.A.? You say to the F.D.A. they did a dose titration system that they wanted the F.D.A. to think would work in the real world.

MR. KISTENBROKER:  That a doctor could really do with a patient.

THE COURT:  Why was that never even mentioned to the investors?

MR. KISTENBROKER:  Because we would have to contrast it with something, which was what we did in phase

three, which no drug company would want their opponents to know, their competitors.

THE COURT:  Well, then --

MR. KISTENBROKER:  There are a lot of people trying to get these things approved that are competing with the same --

THE COURT:  Fair enough.  You have to do something to an investor to make them think that this drug is safe and effective.

MR. KISTENBROKER:  And phase three showed that and we said that.  We only did not say how the dosage for each person in phase three was selected, nor did we say in the N.D.A. that we were suggesting to the government in the real world how the dose would be selected, but what we were arguing to the government was both systems are equivalent.

What this guy can do in the real world we have shown you the data now, government, and here is the number crunching, and he can do one blood draw and replicate this, and that is what drug companies do all of the time.  Axiron did it and got approved and you know they did it because it is up on the government's website.  They had multiple blood draws of titration in the phase three study, and it says very clearly in what the government has posted that in the real world the clinicians will make one blood draw to determine dosage.  It was approved.  This company had that

same belief on their data, that not only was this a safe and effective drug within the dosages that were given in phase three, but it could be replicated by what they suggested to in the N.D.A. in the real world.

THE COURT:  So you are saying that what they represented or what they tried to sell to the F.D.A., which was not successful, was based in at least substantial part on what had been shown in phase three?

MR. KISTENBROKER:  It has to be.

THE COURT:  Yes.

MR. KISTENBROKER:  It has to be because remember, safety and efficacy do not relate to how you're figuring out the dose, titration.  The safe and effective relates to in this case the testosterone drug and how much you give a patient.  They showed that in spades.  They were telling the government that that same result, even though you can't get a patient in your office for 48 hours and stick them with needles for two straight days, can be replicated and here is the data, and be just as good as here.  The government said we think the difference is a little too much for us to approve you right now.  That is what they said.  That is what they said, but that is how this worked and --

THE COURT:  Tell me again what the next step is. You said the next step now --

MR. KISTENBROKER:  As the company warned in every

filing and in every public statement, it could be rejected or the government might require additional clinical tests. They are now doing an additional clinical test.

One of our cautionaries in every filing, unfortunately for the company who has spent millions and how many life hours of sweat, unfortunately that cautionary took place and the government said we need another trial.  That is what they are doing, spending more money in this relentless effort to get this approved.

THE COURT:  Thank you.

MR. KISTENBROKER:  Thank you.

THE COURT:  Ms. Weinrib, any response to that?

MS. WEINRIB:  Yes.

THE COURT:  Please.

It seems like this time I'm getting him a little more clear.  It seems like he is apparently saying that the phase three clinical trials were important to the application to the F.D.A., very important.  It just needed a little tweaking to get a titration system that they claim would work when you didn't have a person under such control as in the phase three trial, and they thought that would work and it would end in an approval and it didn't.

You have heard his argument.  Hopefully we're at least understanding the argument the same way.

What is your response to that?

MS. WEINRIB:  Well, here is the thing, Your Honor. It wasn't a little tweaking.  If you look at the F.D.A.'s own words in rejecting the application, there was a significant difference between what they did in phase three and what they submitted in the N.D.A.  I just want to be clear what this case is about, because I think that the description of what is being done in phase three versus what can in a realistic way be done in clinical, real-world practice is confusing the issue a bit.

We are not saying and we have not stated a single time in our complaint that the defendants took upon themselves a duty to say that the blood would be drawn 17 times in phase three but only one time -- and to go into those specifics and those details.  What we are saying is in your public statements, defendants, consistently throughout the class period you raised the issue of titration.  You said that there would be an initial dose.  You said that if it didn't work, that it would be gradually adjusted to achieve optimal results and then you changed that in the N.D.A.  It is as simple as that.

How that was done in phase three and what the proprietary information about blood draws and times of day and when that was done is irrelevant to the claim here. What is relevant is that there was a duty to disclose that that scheme, in whatever form it took, changed.  They did

discuss that there was a scheme during the class period and they did discuss, as Your Honor aptly noted, certain details about that scheme, even if they didn't discuss how many blood draws specifically.

Defense counsel just said something interesting when he was standing here.  He said they got it right. Well, clearly they didn't get it right because, despite changing the titration scheme in the N.D.A., the F.D.A. still had them go back to the drawing board and conduct new clinical trials that don't have titration at all.  It is not about what they used in phase three.  It is not about what they put in the N.D.A.

The F.D.A. said neither of them are good and they wanted to see what would happen if you test this and try to come to the right dose in the first place and take titration out of the mix completely.  Again, that suggests these were not slight tweaks.  These were issues that were material to the approvability of the N.D.A.

THE COURT:  Do you know what the titration scheme was that was presented to the F.D.A.?  You don't know that, do you?

MS. WEINRIB:  What we do know is that it was discussed -- the subject was discussed during the class period, and what we do know is that the F.D.A. said that they put a new one in the N.D.A. that differed

significantly, that we know, and that is sufficient here.

Whether we know, again, the amounts of blood draws and how it differed or whether it could be done that way in the real world or not, all of that sounds very good and impressive but it is beside the point.

Your Honor, just going back to whether safety and efficacy have a relation to titration or not, I think common sense dictates that it does.  Even if it doesn't, and even if you take safety and efficacy as a topic off the table completely, it still does not change the fact that the defendants spoke and spoke often about titration, spoke about it as a competitive advantage over other products that might or might not have been up for approval yet, and spoke about it as it was applied in phase three when they were touting the results, and then didn't say, oh, by the way, when we ask the F.D.A. to approve this thing, we are not going to use that titration scheme we have been talking about this whole time.  We are going to use something entirely different.

Whether they believed that would actually cause a rejection of the application is also beside the point.  They had to have known, and they don't suggest otherwise, that there was at least a risk that this change, this bait and switch created a risk.  That risk, when you're dealing with a company that has no products approved, nothing generating

revenue for them, and only one product up for approval, clearly that is a material fact that investors should know.

THE COURT:  Well, you're accusing them, of course, of fraud and its close cousin, reckless disregard, which is really just the law's way I think of trying to give a rough equivalent of fraud, and it sounds like there is a possibility here that if we believe the defendants, and they wouldn't probably acknowledge this or admit to it, but maybe they were just negligent.  Maybe they were just not any good at running a phase three study, so it is just negligence on their part.

They thought that they had done enough in phase three to have that be a significant basis for the submission to the F.D.A. and it wasn't, and they didn't try to defraud anybody because there would be no sense in that.  What advantage did that give them?

MS. WEINRIB:  Well, A, Your Honor, they don't suggest that this was a case of negligence.  That is not an argument that they have proffered.  B, the facts certainly suggest otherwise.  Had they thought, reasonably or otherwise, that the phase three results were good enough, then why, as Your Honor asked at the outset of this hearing, why make that switch?  If you're going to make that switch, you're entitled to do so, but alert investors to that fact. I think that is the key here.  I think this also goes to the

defendants' argument of why would they do this, which I can also address if Your Honor would like to hear the plaintiffs' thoughts on this.

THE COURT: Sure.

MS. WEINRIB: First of all, I just want to note that that question of why would they do this goes to motive, which the Tenth Circuit does not require that we establish at this phase of the litigation.

Putting aside that motive is not required, let's look at the situation logically. They say they have spent all of this money and they have gone through discussions with the F.D.A., they have gone through clinical testing, they have gone through all of this effort and why do that for an N.D.A. that now is going to certainly be rejected?

Well, first of all, the money had already been spent. They had already had the conversations with the F.D.A. They had already conducted the clinical trials. Now they were at a point where they see, okay, we have to do something here. There are two options. We can submit the N.D.A., and we have already spent the money, or we can spend more money and go back to the drawing board and either clinically test this substituted titration scheme or do away with it completely and move on to fixed dose studies, which is ultimately what happened.

So for a company, again, that is not generating

any revenue, one product up for approval, they have already spent the money, why not take a chance?  Again, they are entitled to.  Take that gamble.  That is not what invites 10(b) liability.  Taking that gamble is not where the liability comes in.  It is taking the gamble without alerting the market to the gamble.  That is the problem.

And, interestingly enough, the defendants also argue that this is a new argument, that it must have been so bad that they substituted something new and then had to move on to fixed dosing.  Well, the fixed dosing issue is something that was post class period so it couldn't be in the complaint, and they attach it as an exhibit to their motion, so just in terms of what the plaintiffs are able to proffer as far as an argument and what they are not, the defendants are going to use it in support of their motion and we can certainly use that same fact in arguing against it.

THE COURT:  Do you have any belief, based on what you know happened, about when you claim that the defendants knew that they were going to be presenting a different titration scheme to the F.D.A. than the one that they had employed in phase three?

MS. WEINRIB:  The most plausible inference is that that was at the outset of the class period.  The phase three trial had already been completed and the data analyzed so at

the outset they knew.

At a minimum, even if there was some dispute over that, which I don't think there could be, and they don't suggest that they didn't know at that point, the N.D.A. was submitted shortly thereafter.  The N.D.A., obviously, upon submission had a different titration scheme that they knew at that point in time.  N.D.A.s don't get drafted overnight, Your Honor.  They take time to draft.  Phase three data takes time to get through.  I think the timing here creates the most compelling of inferences, which is that at the time the class period began, they already knew that a new titration scheme was going into the application.

THE COURT:  Thank you.

I am satisfied there is plausible claim stated and the motion is denied.  I find based on the statements that have been presented in the complaint itself and in the briefing about the press releases and the presentation at the health conference and otherwise present a plausible claim that the defendants withheld material information by way of omission or not representing that a different titration plan or scheme would be presented to the F.D.A. than that that was allegedly touted as showing the product to be safe and efficacious during the phase three study.  I see it that simply.

I would ask Ms. Weinrib to prepare an order to

that effect and we'll see where this goes. It might head for summary judgment. I don't know.

Thank you for your arguments.

Court is in recess.

MS. WEINRIB: By what date would you like that?

THE COURT: As soon as you can get it approved as to form by the other side.

MS. WEINRIB: Okay.

THE COURT: So as soon as you can do it.

MS. WEINRIB: Thank you, Your Honor.

THE COURT: Court is in recess.

MR. KISTENBROKER: Thank you, Your Honor.

(Proceedings concluded.)