IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| SOLOMON ABADY, ) | |
| Individually and On ) | |
| Behalf of All other ) | |
| Similarly Situated, et ) | |
| al, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 2:19-CV-00906 |
| ) | |
| LIPOCINE INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

BEFORE THE HONORABLE CLARK WADDOUPS

January 12, 2022

Motion to Dismiss Hearing by Zoom

1

**Appearances of Counsel:**

For the Plaintiff:        Daniel Tyre-Karp
                          Phillip Kim
                          Attorneys at Law
                          The Rosen Law Firm P.A.
                          275 Madison Avenue
                          40th Floor
                          New York, New York 10016

                          Jordan Pate
                          Attorney at Law
                          James Dodge Russell & Stephens PC
                          10 W. Broadway
                          Suite 400
                          Salt Lake City, Utah 84111

For the Defendant:        Milo Steven Marsden
                          Attorney at Law
                          Dorsey & Whitney
                          111 S. Main Street
                          21st Floor
                          Salt Lake City, Utah 84111

                          Ryan E. Blair
                          Koji F. Fukumura
                          Heather Marie Speers
                          Dylan Scott
                          Attorneys at Law
                          Cooley LLP
                          4401 Eastgate Mall
                          San Diego, California 92121

Court Reporter:

                  Laura W. Robinson, RPR, FCRR, CSR, CP
                        351 South West Temple
                        8.430 U.S. Courthouse
                      Salt Lake City, Utah 84101
                            (801)328-4800

**Salt Lake City, Utah**                    **January 12, 2022**

*   *   *   *   *

THE CLERK:  Thank you so much.  Judge Waddoups, it does appear that we're ready to begin.

THE COURT:  Thank you.  We're here in the matter of *Solomon Abady versus Lipocine and others*, case 2:19-CV-906.  Will counsel please state their appearance.

MR. MARSDEN:  Your Honor, Milo Steven Marsden on behalf of the defendant.  With me is Ryan Blair and I'll let him introduce his team.

MR. BLAIR:  Yes.  Good morning, Your Honor.  This is Ryan Blair from Cooley on behalf of defendants.  Also with me from the Cooley firm is Koji Fukumura, Heather Speers, and Dylan Scott.  Also on the line is a client representative Lipocine CFO Morgan Brown.

THE COURT:  Thank you.

MR. PATE:  Good morning, Your Honor.  This is Jordan Pate for the plaintiffs with the firm James, Dodge, Russell & Stephens in Salt Lake City.  With me is Daniel Tyre-Karp and I'll let him introduce his team.

MR. TYRE-KARP:  Good morning, Your Honor.  This is Daniel Tyre-Karp from the Rosen Law Firm.  We represent lead plaintiff and the class.  I am here with my colleague Phillip Kim.

THE COURT:  Thank you.  We are here on the

defendant's motion to dismiss.  I have reviewed the pleadings in support of the motion and the opposition and the relevant related documents.  Defense counsel may proceed with their argument.

MR. BLAIR:  Thank you very much, Your Honor.  And thank you again for your time to allow us to present.  Again, my name is Ryan Blair from Cooley, LLP, and I'm here on behalf of defendants Lipocine and its CEO Dr. Mahesh Patel.

Like you said, I know Your Honor has read the briefs, so I do not intend to repeat what is in our papers.  I also recognize that Your Honor is familiar with the strict and heightened pleading standards in securities class actions like this one.

In particular, Federal Rule of Civil Procedure 9(b) and the standards for pleading falsity and scienter set out in the PSLRA.  So I won't belabor them.

This case centers on Lipocine's years long development of a novel and unique treatment for men with low testosterone called TLANDO.  Now, what makes TLANDO unique is that it is in a pill form and it is taken orally twice daily.  Now currently, most commonly used and FDA approved testosterone replacement therapies, or TRTs as I'll refer to this morning, are either in topical or gel form applied daily or weekly, or injected weekly or monthly by a needle.

4

Now both of those formulations have some serious downsides. With gels, there is a significant risk of secondary exposure, particularly to women or children. With injections, there is, of course, needle phobia but there is also the serious risk of infection at injection site reactions.

Now, TLANDO's oral TRT formulation eliminates or extremely minimizes those risks. And further, because it is in pill form, it lends itself to better patient compliance. In short, this is a potentially very important drug serving an unmet need for the one out of every four men over 30 who have low testosterone levels according to recent research.

So what is this specific case about. Now, on its face I'll agree it seems more complicated than it really is. Now part of that is because the complaint and the parties papers go into great detail about a particular TLANDO clinical trial called the Dosing Validation or DV study. That we focus on a certain result in that DV study which related to the measurement of maximum testosterone or Cmax levels in that study. And we also talk about whether the Cmax measurements were calculated per day or per dose. Here, two times per day.

But taking just a step back, plaintiff's theory of fraud is neither complicated nor viable as a matter of law. Now, their overarching theory is that Lipocine

5

intentionally omitted information about TLANDO's results, specifically the DV study results, to mislead investors about the drugs prospects for FDA approval.

Now, plaintiffs won't disagree with that theory of fraud. But setting aside the fact that TLANDO has now received tentative approval from the FDA subsequent to the completion of the parties briefing on this motion, plaintiff's theory suffers from four fatal problems.

First, there is no question that prior to the alleged class period Lipocine itself publicly disclosed all of the clinical trial results plaintiff's claim Lipocine was trying to hide. And specifically, the exact per day results from the DV study. Now those were included in the company's briefing document that was submitted in advance of an FDA Advisory Committee Meeting for TLANDO in January 2018. And those results were discussed at length at that meeting. That's their first point.

The second point, it was no secret to anyone that those per day results failed to meet the FDA's prespecified secondary end points. I want to be clear, since June 2017, Lipocine repeatedly disclosed that TLANDO's per day results did not meet those thresholds. But the issue during the class period, during 2019, was not and never was whether TLANDO met or exceeded those Cmax thresholds. Rather, the issue during the class period was whether Lipocine could

present a compelling case to the FDA explaining why those end points shouldn't apply to TLANDO because of its unique formulation and unique effect on the body when compared to other TRTs.  That's point two.

The third point.  There are no allegations to suggest that during the class period defendants did not honestly hold their publicly stated beliefs, or that the FDA communicated to Lipocine that the DV study results would jeopardize the timing or ultimate approval of the drug. And, Your Honor, this falls squarely within the *Noble Asset Management* case.  A case that plaintiff doesn't cite in its opposition, by the way.  And that case put it very clearly. There was no showing that the FDA's ultimate response to TLANDO's NDA was a foregone conclusion.  Indeed, it was only until the very end of the class period when the company received another CRL that the company learned of the FDA's position on the issue.  But it's black letter law that a plaintiff cannot plead fraud by hindsight and that's precisely what they're trying to do here.

And finally, the fourth point, Your Honor, before I dive into each of these, plaintiffs have yet to put forth a plausible explanation to the following question.  Why? Why would Lipocine continue to spend millions of dollars on a drug it apparently knew was going to fail back in 2017 well before the class period even began?  Why would

7

Dr. Patel commit professional and financial ruin, as we note, he purchased stock, Lipocine stock, on the open market during the class period. Why would he do that if he was part of an elaborate scheme of fraud?

Like the *Endologix* case that we cite, it really doesn't make any sense. And like the *Sanofi* case, which we also cite, as a matter of law it's not plausible that a company would continue to fund a drugs development while secretly believing FDA approval was unlikely.

Now, I briefly would like to touch a bit more on detail on each of those four points starting in reverse order. So starting with motive. And regarding motive, it's not just that the complaint is bereft of a single allegation that any defendant had a plausible motive to commit fraud, it's worse. The complaint attempts to invent a motive by grossly distorting the chronology of events. And I would like to direct Your Honor's attention to Paragraphs 4 and 60 of the complaint.

Now in those paragraphs, plaintiff alleged that on March 27, 2019, defendants, this is their language, hurriedly announced that it was planning to resubmit the TLANDO NDA in 2019 because a competing TRT product called Jatenzo had been granted FDA approval on the same day.

Your Honor, putting aside that that allegation is conclusory and not supported by any factual allegation, it

8

is squarely belied by both the record before the court and the complaint itself.  Now for the record, I would like to refer Your Honor to what we call Exhibit D attached to our declaration.  It's also, if you prefer, the ECF docket cites, it is docket number 48-5 at Page 4.

Now this document is Lipocine's Form 10-Q filed with the SEC on November 7, 2018.  That's four months before that March 2019 statement.  Now what Lipocine said in that filing it made clear to investors that Lipocine contemplated resubmitting the NDA well before March 27, 2019.  And because it's so important, I think I would like if with Your Honor's permission read it into the record.  It states, quote, "On July 19, 2018, we completed a post-action meeting with the FDA in which the deficiencies raised in the CRL were discussed and a path forward for NDA resubmission for the potential approval of TLANDO was clarified."  The disclosure went on.  Quote, "Assuming the results from the ABPM clinical study which was a blood pressure study were positive," quote, "we expect resubmission to occur in the first half of 2019."

Now, this statement plainly refutes the allegation that Lipocine's decision to resubmit the NDA was somehow tethered to Jatenzo's approval months later.  It renders any inference nonsensical frankly and it's -- it's as a result of that that it is no surprise that plaintiff

doesn't reference this disclosure or this document at all in the complaint or in his opposition papers. But Your Honor doesn't even need to get to Exhibit D. It can go to Paragraph 75 of the complaint itself which is the company's 2018 Form 10-K which makes the same exact disclosure and which was three weeks before that March 27, 2019, statement to which plaintiffs refer at Paragraphs 4 and 60.

This contention -- now as for that March statement itself, that March 27, 2019, press release, the statements in paragraphs 4 and 60 come from a Lipocine press release talking about that blood pressure study. And the results of that study were overwhelmingly positive and plaintiffs wouldn't disagree. So as such, that disclosure Lipocine is simply reiterating its intent to resubmit the NDA in mid 2019 entirely consistent with what they said back in November of 2018. Thus, this idea that Lipocine somehow prematurely rushed this NDA submission in response to the approval of Jatenzo is simply not credible.

Now there is a related point that plaintiff makes here as well which is that because Lipocine rushed its NDA resubmission, defendants didn't take sufficient time to complete new clinical trials, to address this Cmax issue identified in the CRL. Now this is Paragraphs 57 and 60 of the complaint.

But again, I want to be clear. There is nothing

10

in the record to suggest that Lipocine was even allowed much less required by the FDA to run new trials to come up with different Cmax results.  And I want to be -- nor did Lipocine say that it was going to do so.  To the contrary, both before and during the class period, Lipocine consistently said that it would perform additional analyses of existing data in order to address the Cmax deficiency. And there are no facts alleged, particularized or otherwise, to suggest that Lipocine did not in fact conduct those analyses when it resubmitted the NDA.

Now the only other motive allegation that plaintiffs set forth is one is that they needed to raise money to stay afloat.  Well, that would be -- that could be said of any public company and particularly any clinical stage biotechnology company who needed to perform additional studies to resubmit an NDA.

Now, the *Fleming* case, *Noble Asset Management,* all make clear that a motive, that a desire to raise money simply cannot establish a strong inference of scienter.  And respectfully, I think that the court should find so.

Now, I started with motive because the absence of motive allegations is important especially in the Tenth Circuit because the *Williams Companies* case holds that where there is an absence of apparent motive, a finding of scienter is more difficult to sustain and the other facts

11

supporting scienter must be quite particularized and compelling. And again, that's the *Williams Companies* case, that is 889 F3.d at 1173.

So put differently, the absence of motive renders the heavy burden at the pleading stage that's outlined by the *Zagg* case even harder to meet which in the case of omissions, like we have here, requires not just that defendants knew of the allegedly omitted fact, that is prong one, but also that defendants knew that the failure to reveal that fact would likely mislead investors. That's prong two. And prong two from *Zagg* is particularly important in the context of drug development and clinical trials. Because differing interpretations of clinic data aren't just possible, they're likely in this -- in these types of circumstances. And that's laid out in the *Hirtenstein* and *Sanofi* cases that we've cited in our briefs.

Now, plaintiffs hang their hat almost exclusively on the fact that Dr. Patel was involved in the TLANDO program and presented at the AdCom meeting in 2018. But again, that only gets at *Zagg's* first prong. And the mere knowledge of an omitted fact standing alone doesn't equate to a strong inference of scienter.

Now, it's this second prong which plaintiffs come no where close to pleading that requires them to provide sufficient factual allegations to indicate defendants

12

understood that their public statements were inaccurate or were highly unreasonable in failing to appreciate that possibility. But the only allegations that are in the complaint are entirely conclusory. And I will direct your attention to Paragraph 97 of the complaint which states, quote, "The company and Patel acted with scienter because the company and Patel knew that the public document and statements issued or disseminated in the name of the company were materially false and/or misleading." Your Honor, that's a legal conclusion, that's not a fact, and it should be disregarded here.

So in addition to that, there are no particularized allegations to support a strong inference that defendants should have known that the omission of the detailed per day results in the DV study could have potentially misled investors. Indeed, defendant's views with respect to TLANDO and the DV study were laid bear to investors far before the class period at the Advisory Committee Meeting.

And this meeting is critically important because it is the only evidence in the record suggesting what defendants truly believe and why they believed it. And so this is at Docket Number 48-4, it is also referred to as Exhibit C, and it is the Advisory Committee Transcript. And at pages 15 and 16 of that transcript, Lipocine stated the

13

following, quote, "We carefully evaluated the relevance of Cmax excursions with respect to safety.  We noted that the excursions were transient and isolated events.  We looked at the correlations between Cmax values greater than 1,500 with adverse events and did not see any differences in subjects with values greater than 1,500 versus those with values less than or equal to 1,500.  Put differently, these Cmax excursions didn't increase the adverse events that patients suffered."

Now, Lipocine continued to compare TLANDO to the other TRTs that I talked about earlier.  This is at Page 16.  Quote, "Just one other thing to mention about the Cmax is that we have two opportunities to exceed this criteria under the per day analysis, whereas these criteria, we believe, were probably initially developed for the transdermal and longer acting products.  For instance, an injectable product has one Cmax in 10 weeks, a transdermal product has one Cmax per day, and when they do have excursions, those excursions can lead to prolonged testosterone levels.

So we feel we were primarily developed for products that would provide -- so we feel those end points, those thresholds, were primarily developed for products that would provide sustained testosterone levels at a high level.  Ours do not do that.  We do see a very transient thing.  Now, that's Lipocine's belief of these results.

14

Now, the reasonable nature of defendant's interpretation was supported by members of the AdCom to which Lipocine was presented.  And this is at Page 19. Quote, "I think the sponsor's made a persuasive argument with their data regarding how long patients spend at those peaks and also the very real point that with this kind of BID drug, BID means twice a day, they have many more opportunities to have a max than for other formulations."

"So in the absence of evidence that the peaks are that important or rather as compared to overall exposure, I think that although they don't meet the secondary endpoints, those criteria may be for other drug formulations.  I don't find this of concern."

Now, the views of the AdCom are important for scienter.  That is exactly what the *Noble Asset Management* case found.  The court carefully considered statements from AdCom members that were in line with the company's beliefs in finding that there was no strong inference of scienter. That is at 2005 WestLaw 4161977 at Star 13.

Now in the face of all of that, defendant's stated beliefs as to the DV study results.  And quite frankly, somewhat inexplicably, plaintiffs identify no contemporaneous fact in the complaint or elsewhere that defendants did not actually hold those stated interpretations and beliefs during the class period.  There

15

is none of the hallmarks of a securities fraud case that has merit. There are no allegations attributable to former Lipocine employees or any other confidential witnesses claiming that Lipocine management held a contrary view. There is no internal documents suggesting that when Lipocine ran these additional analyses they didn't believe that they sufficiently addressed Cmax deficiency.

And finally, there is nothing from the FDA to Lipocine, no communications or otherwise during the class period, indicating that the existing Cmax results or the company's explanation as to why those results should not be applicable to TLANDO were a significant impediment to FDA approval.

And this last point, the absence of FDA communications during the class period, is particularly fatal to plaintiff's argument here. And this is the *Smith versus Antares* case, this is the *Dynavax* case that we have cited, and that plaintiff's don't even attempt to distinguish. Those cases are squarely on point. They come from jurisdictions that decide Life Science cases on a regular basis, and both of them hold that in the FDA approval context, scienter fails where the plaintiff doesn't allege the FDA communicated to defendants that the allegedly undisclosed problems would hinder approval at the time they made optimistic statements about a company's drug candidate.

16

That -- that -- essentially that's the whole ball game with respect to scienter. There is nothing during the class period from the FDA to Lipocine suggesting that there were problems with its analysis. So whether you consider all of the allegations individually or holistically as *Tellabs* required, they haven't come close to a strong, cogent, or compelling inference of scienter.

Now, I want to turn briefly to the element of falsity. Now in the Tenth Circuit, the Tenth Circuit holds that a duty to disclose not only where the statement is both material and the omitted fact alters the meaning of the statement. Again, this is the *Williams Companies* case. But as articulated by *Rigel* in the drug development context, that's a Ninth Circuit case at 697 F3.d at 881. A plaintiff can't plead falsity by simply claiming that investors may have wanted additional information or additional results from the clinical trial. Rather, the allegedly omitted information must be at odds with what the company actually disclosed about that trial. And here, plaintiffs also can make no such showing of falsity.

So let's start with plaintiff's main challenge. They claim that Lipocine misled investors by disclosing the specific per dose results from the DV study but not the specific per day results in public disclosures during the class period. This argument fails for four reasons. First,

17

aside from plaintiff's own interpretation, there is nothing to substantiate their claim that the per day results were somehow more important than the per dose results or that the per dose results were some sort of smokescreen.

Again, I want to be crystal clear here. Lipocine disclosed that because TLANDO was administered twice daily, it would conduct both a per dose and per day analysis and put those two analyses in the clinical trial protocol even before the study even began. There was always going to be two analyses of the data, per day and per dose. And that is set out Docket Number 48-3 at pages 15 and 16.

Now, the rationale for the two analyses is not really hard to discern with TLANDO being administered two times a day versus other treatments that were administered either daily or weekly. Lipocine believed that the per dose analysis was likely a more apples to apples comparison compared to those products. So that's the first point.

The second point, and plaintiffs won't dispute this, Lipocine disclosed at all times that TLANDO did not meet the secondary endpoints under the per day analysis. They have been doing that since June of 2017. And this is at paragraphs 76, 84, 90 and elsewhere. Lipocine stated quote, "Deviations from the pre-determined limits in the DV study were observed in the Cmax per day dose analysis for these thresholds," end quote.

18

Now plaintiffs have yet to articulate how the omission of the actual quantitative per day results could possibly have been misleading given Lipocine unambiguous qualitative disclosure that the per day results did not meet these Cmax thresholds.  Put simply, the quantitative results would not have altered the qualitative disclosure.  And this is precisely what the court held in the *Smith* case, the *Smith v Antares* case.  And at Star 6 of that case the court states, quote, "Here, Antares informed the public that hypertension was a common adverse event observed in the '03 study, and was not duty bound to disclose the exact statistical risk of any adverse events."  That's precisely what happened here.

Lipocine made a qualitative and accurate statement that the per day results didn't meet the secondary endpoints.  And because it did so, it needn't also disclose the actual results themselves.  But here is the third point.  This isn't a case where those results were hidden.  Quite the contrary.  And as we have discussed, they were fully disclosed at the AdCom in 2018.  If an investor wanted to know those specific per day results, the information was clearly in the public domain as reflected by analyst reports who discussed at length how Lipocine viewed the DV study, how the AdCom responded, and what those results were.

Now, plaintiffs have cited no authority stating

19

that Lipocine was required to continue disclosing those per day results each time it talked about TLANDO. And in fact the *Sanofi* case held precisely the opposite. They held that the securities laws do not require regurgitation.

Now, in that case, much like this case, the plaintiff in *Sanofi* argued that *Sanofi's* statements were misleading because they only provided a quote, "brief synopsis of the drug safety profile and did not fully explain its serious and potentially fatal side effects."

The court rejected that argument that whole cloth because, quote, "Every adverse event that had been observed in the clinical trials had been publicly disclosed prior to the start of the class period." So it is here. That is exactly what happened.

Now, plaintiffs, I'm sure, when they present their argument will talk about this concept called a truth on the market defense. Now, it is clever, but I want to be clear that this defense only applies where a defendant attempts to prove that the truth made its way to the market through sources other than the defendant's themselves. And that is not what we have here. We have Lipocine itself disclosing the allegedly omitted results prior to the class period. And we have cited the *Chang versus Accelerate Diagnostics* case which makes that distinction crystal clear. And my colleagues Mr. Kim will be well familiar with that

20

case because they were plaintiff's counsel in that case.

And again, that case makes clear that where the defendants themselves make the statements to the market, the truth on the market defense simply is not implicated.

And my last point on this per day versus per dose statements, I want to pull back a little bit because I think it is important to keep in mind what exactly the FDA was asking Lipocine to do with respect to the Cmax deficiency during the class period. The FDA was not and never asked Lipocine to redo the DV study to see if it could come up with new numbers or meet the thresholds. Rather, it was asking Lipocine to explain to them why their endpoints generally weren't applicable to TLANDO.

And again, the company's explanation, isolated transient events, no uptick in adverse events, and that was their publicly stated opinion. The FDA said nothing in response ultimately until the CRL. All of this was plainly explained to investors at all times. So, you know, I guess why would the additional details of Cmax per day results even matter. And plaintiffs don't really have an answer to that question.

Now, two more quick points on falsity and I -- I will pass my time over to plaintiff's counsel. Plaintiffs take issue with a statement that Lipocine, quote, "Met a key secondary endpoint." Now again, plaintiffs are trying to

21

invent a contradiction by arguing that Lipocine on the one hand stated that it didn't meet secondary endpoints in press releases and SEC filings during the class period, but on the other hand stated in a January 19 corporate presentation that it met a key secondary endpoint.  And this is Paragraph 72 of the complaint.

This argument fails on two fronts.  First, the statements are not inconsistent in any way when they're considered in context.  And if you look at Paragraph 72, it makes clear that Lipocine's interpretation that it met the key secondary endpoint was based on eligible subjects.

Now, it's undisputed that there was one subject in this study who exceeded the highest Cmax threshold, but this same subject and the plaintiffs, Lipocine and the FDA would agree, had a medical condition called Cholecystectomy, or he had, essentially, gallbladder surgery which warranted his exclusion from the study.  That wasn't determined until after he was enrolled and after the data had been obtained.

Now, Lipocine disclosed this fact.  To be clear, Paragraph 76 of the complaint, Lipocine disclosed, quote, "Only one subject who was a major protocol violator exceeded the 2,500 limit independent of per dose or per day dose analyses."  Another person -- I'm sorry, in other words, Lipocine said this person was not an eligible subject.  So all of those who were eligible stayed below that threshold

22

and this is exactly what Lipocine disclosed in the presentation.

Now, did the results meet the key secondary endpoint when looking at the entire trial population including this subject? No. And the company has never said otherwise. But did Lipocine believe it met this key secondary endpoint based on eligible subjects? Absolutely.

Now, plaintiffs want to claim defendant's interpretation of this data was unreasonable because the FDA allegedly rejected Lipocine's suggestion that this subject should be removed from the dataset. But plaintiffs really are distorting their own allegations here because the only thing that the FDA said, and this is at Paragraph 48 of the complaint, was that it was, quote, "Unclear whether the subjects condition was the cause of the excursion and requested that the Advisory Committee explore the issue." But the FDA -- but the FDA there at Paragraph 48 did not say that it would be unreasonable to exclude that protocol violator from Lipocine's interpretation that the key secondary endpoint was met. Now, if anything, the FDA's lacked clarity on the issue only shows that reasonable minds can differ.

Now, there is one more -- one more key statement that plaintiff challenged and it's also in that same corporate presentation and it talks about how Lipocine

23

stating that TLANDO's other secondary endpoints were generally consistent with approved products.

Now here we're clearly in the realm of interpretation of clinical results which as the *Smith versus Antares* and the *Aspenbio* cases hold are really no different than opinions. And because it's an opinion statement, plaintiffs need to show that the defendants either did not actually hold that belief or that it was highly unreasonable for defendants to do so.

And frankly, they do no such thing. Now they attempt to by noting that the FDA had never approved a comparable TRT product that deviated from the pre-determined secondary endpoint. But at the time that statement was made, there were no oral TRT products like TLANDO.

Now plaintiffs would argue but wait there is Jatenzo. But Jatenzo wasn't approved by the FDA until March 27, 2019. So when defendants made this statement, it was attempting to compare its oral TRT product to the gel and injectable products that have those bigger or sustained Cmax excursions.

Now both FDA and Lipocine have acknowledged that that pure apples to apples comparison is pretty difficult considering that TLANDO Cmax excursions are isolated and transient, and that -- and that the other TRT products are these sort of big and sustained. But there is nothing else

24

in the record that suggests that defendant's view that it was -- that the percentages were relatively close to other injectable and gel products was reasonable.  And frankly it was given everything that the company said at the Advisory Committee Meeting.

Your Honor, mindful of the court's time, with respect to the other challenged statements I can address them, but I will say that all of them have absolutely nothing to do with the allegedly omitted per day DV study results.  So unless Your Honor has questions, I'll reserve my time.

THE COURT:  I'll give you an opportunity to respond after the plaintiffs submit their case.  But thank you.  Let's hear from the plaintiff's counsel at this point.

MR. TYRE-KARP:  Thank you, Your Honor.  This is Daniel Tyre-Karp from the Rosen Law Firm.  And I wanted to repeat Mr. Blair's thanks for the opportunity to present our cases.  And like Mr. Blair, I know that you have read the papers carefully, both the pleadings and the motion to dismiss briefs, so I will try not to repeat the arguments verbatim, but I need to go over a summary of our arguments and to address some of the comments that Mr. Blair made.

First, I think that Mr. Blair did not accurately describe the scienter allegations in the complaint.  So I can start with those which would also give us a broader time

25

line.

Now, Lipocine was founded by Dr. Patel in 1997 and has never had a product approved by the FDA to hit the market as basically --

THE COURT:  What does that have to do with anything?

MR. TYRE-KARP:  It gets to the motive allegation.

THE COURT:  It seems to me, as I was reading through the complaint, there is a lot of information you throw in there to say this is a bad investment, but it doesn't support fraud.  And I am disturbed by the fact that you throw in a bunch of information that really doesn't go to direct issues that have been raised by the defense.  For example, well, let me just clarify.  As I read the complaint, I don't see that the plaintiff is claiming any false affirmative misrepresentations.

MR. TYRE-KARP:  Your Honor, the complaint alleges two very clear false representations both of which Mr. Blair just mentioned, both of which are in the investor presentation, and one of which is that the company says that it met a key secondary endpoint.  And as Mr. Blair correctly said, there is evidence of what the company truly believed and it's in the briefing for the BRUDAC committee in front of the FDA in January 2018.

THE COURT:  Well, let's back up to that

misstatement. They also disclose at the same time that they did not meet the secondary endpoints.

MR. TYRE-KARP: In that investor --

THE COURT: How do you claim an affirmative misrepresentation that is completely contrary to what the company disclosed?

MR. TYRE-KARP: The company did not disclose in that investor presentation that it did not meet the Cmax secondary endpoints.

THE COURT: Well, that's not how I read the complaint.

MR. TYRE-KARP: In that investor presentation, Your Honor, the company said we met the key secondary endpoint. And first of all, there is no key secondary endpoint. All three secondary endpoints are equally important. Second, they did not meet it. They did not -- they told the FDA they did not meet it. The FDA told them that --

THE COURT: The secondary endpoint you're talking about is whether or not they exceeded the Cmax in the ineligible subject. And they disclosed that he was an ineligible subject.

MR. TYRE-KARP: The FDA said that it's not at all clear and that Lipocine had not presented evidence that the gallbladder surgery was a Cmax excursion.

27

THE COURT:  That is a different fact than whether there is an affirmative misrepresentation.  The fact that the FDA said it was unclear doesn't make it false.

MR. TYRE-KARP:  The FDA said they did not meet any of the three secondary endpoints.  The company itself said it had not met any of the three secondary endpoints.  Even if they had met the secondary endpoint is therefore false and misleading.

THE COURT:  What is your second affirmative misrepresentation you claim?

MR. TYRE-KARP:  In that same presentation, the company says that, the company and Dr. Patel who presented it, that the other two secondary endpoints were comparable to other approved products.

THE COURT:  That's an opinion.

MR. TYRE-KARP:  And opinions can be false.

THE COURT:  Yes, but there is no evidence in this case that the company believed that they were false.

MR. TYRE-KARP:  So the thresholds for the other two endpoints, 85 percent of patients must have a Cmax below 1,500.  And the FDA at that point had never approved a product that had been below 84 percent.

THE COURT:  They had never approved a product that was an oral dosing.

MR. TYRE-KARP:  So if the company -- if there is

28

no comparable product, why is the company telling investors that -- that their secondary endpoints are similar to other products.

THE COURT:  It's an opinion.

MR. TYRE-KARP:  The FDA had never approved a product below 84 percent and they were at 74 percent.

THE COURT:  Okay.  I understand your argument, I'm not persuaded.

MR. TYRE-KARP:  I think that if you take a broader step back, Your Honor, it becomes more clear that there was a conscious effort to mislead investors about what the proper measure of Cmax was.

THE COURT:  You're going to have to be much more persuasive than you have been so far in your pleadings.

MR. TYRE-KARP:  I will do my best, Your Honor.

THE COURT:  To convince me that you're going to survive this motion.  So let's hear your best argument.

MR. TYRE-KARP:  That if you look at the misstatements in concert with the facts on the ground, the fact is that the company disclosed it was running out of money and it needed a cash infusion to be able to continue operations.

THE COURT:  That argument goes -- that argument goes no where.

MR. TYRE-KARP:  Jatenzo was approved.

29

THE COURT:  Every company that's raising funds is in that situation.

MR. TYRE-KARP:  Jatenzo, which is another oral testosterone replacement therapy, but it's also taken twice per day, was approved by the FDA on March 27, 2019.  And Mr. Blair made a big showing of the fact that Lipocine announced that same day that it would resubmit the NDA for TLANDO is meaningless because the company had previously disclosed that it would submit an NDA.

The plaintiffs do not plead that Lipocine suddenly decided it would submit an NDA.  We think they always planned to submit it.  Our argument is they rushed it in respond to the Jatenzo NDA.  And the reason the Jatenzo NDA was an existential threat to Lipocine is because if Jatenzo beats Lipocine to market, not only would it gobble up the marketshare that Lipocine wanted for TLANDO, but the FDA grants a three-year exclusivity period for the first drug to hit the market, the first oral testosterone replacement.

And so when Jatenzo was approved, not only did Lipocine immediately announce that it was filing its third NDA for TLANDO, it also sued Jatenzo within one week for patent infringement in an attempt to delay Jatenzo from hitting the market.  Because it knew that if Jatenzo hit the market, that TLANDO would not believe able to hit the market

30

for at least three years.  Even if it got FDA approval.  So they had to move fast, they had to move forward as quickly as possible, and they rushed their NDA.  And throughout the class period, they told investors on the one hand we're hitting the per dose thresholds, we're very close to the per dose threshold, we're hitting them, we're going to get approved, Cmax was not a problem.  And now they're saying, Cmax is not an issue, no one cares about Cmax.  But the point is, Cmax was an issue.  They were telling investors that it is important, that we are hitting the secondary endpoints, that the secondary endpoints for TLANDO are similar to the secondary endpoints for other approved drugs. And they said this before --

THE COURT:  Any investor that is reading these disclosures was clearly advised that there were issues about whether or not the secondary endpoints would be met.  Isn't that true?

MR. TYRE-KARP:  And defendants did everything they did to -- everything they could to assure investors that it was not going to be a serious impediment.  And --

THE COURT:  But that's not -- that's a statement of their confidence level that they can satisfy the requirements.  Any investor knew that this was a risk.

MR. TYRE-KARP:  Your Honor, the --

THE COURT:  Clearly disclosed.

31

MR. TYRE-KARP:  -- the fact that they -- they said there are two different measurements and each 10Q and 10K filing during the class period they disclosed there are two different measurements for the endpoints.  These are the endpoints, these are the different -- these are the two different measurements.  These are measurements that we got on the per dose.  Also, there were deviations on the per day.  They never disclosed, never tell investors that the only measurement that matters is the per day measurement. They never tell investors that the only measurement the FDA has ever used is the per day measurements.  They don't tell investors that Jatenzo, which is also an oral -- an oral testosterone replacement therapy drug taken twice per day had a BRUDAC meeting the day before TLANDO did in 2018, and was judged solely on the per day analysis, the same analysis that TLANDO has used, the same analysis that the FDA used for them, and Mr. Blair made a big point that TLANDO is unique and therefore should have a unique testing regime that's per dose instead of per day.  But it's not unique. Jatenzo uses the same dosing regime.  The same oral treatment twice a day, and they used the same per day analysis, not the per dose analysis, that each and every other approved drug used.  And they hit the thresholds because those are the thresholds that the FDA cares about. And Lipocine misled investors in the market into believing

that what mattered for Lipocine was their 85 percent and seven percent, instead of their 74 percent and 14 percent.

And you can tell that the company had miss -- successfully misled investors in the market because two of the analysts who follow Lipocine both issued reports after the CRL was issued in November 2019 comparing the secondary Cmax endpoints of TLANDO to Jatenzo and saying look, they're so similar TLANDO should have been approved, Lipocine should appeal this, look how similar they are, how could they approved Jatenzo and not approve Lipocine.

They were completely misled into comparing the per day testing for Jatenzo to the per dose testing for Lipocine.

THE COURT:  I would understand your argument if the evidence were that Lipocine had represented that those percentages and those Cmax levels were per day.  They didn't.  They clearly disclosed that they were per dose. And they clearly disclosed, as you allege in your complaint, that those didn't meet the per day Cmax requirements.  So...

MR. TYRE-KARP:  They did not disclose that that is what matters.

THE COURT:  No, they did disclose that.  That is --

MR. TYRE-KARP:  They did not disclose during the class period that what mattered was the per day testing

33

requirements.

THE COURT:  But you put in there that that is what mattered.

MR. TYRE-KARP:  It is what matters.  That's not what they disclosed, Your Honor.  After the class period --

THE COURT:  Would you stop when I'm talking.

MR. TYRE-KARP:  I'm sorry, Your Honor.

THE COURT:  They did disclose that it didn't meet the per day Cmax limits.  Now, you -- you seem -- your whole argument seems to be they should have said well that's not what really mattered.  I am just not convinced, based on your arguments so far, and your pleading, that that's enough to create a securities fraud violation.  So you need to address that issue.

MR. TYRE-KARP:  So after this lawsuit was filed, after -- in the start of 2020, after using the same disclosure in each Q and K during the class period that deviations from the pre-determined limits and the DV study were observed in the Cmax per day dose analysis for these thresholds, that's all they said about the per day.  They added this line, "As such, this efficacy trial did not meet the three Cmax per day secondary endpoints."  A very simply statement that instead of saying here is the per dose, here is the per day, you try to figure it out yourself investors which one mattered.  By the way we described the per dose

34

analysis thresholds and what our exact numbers were for each one without explaining what we did for the per dose one -- per day one. They added this explanation, after this lawsuit was filed because they knew it was insufficient. They said that they did not meet the Cmax per day secondary endpoints because they failed to meet the ones that actually mattered. And they misled investors throughout the class period that the per dose ones were what the FDA cared about. There is no indication that the FDA cared about the per dose numbers. The FDA told them at the BRUDAC meeting that they failed to meet the secondary endpoints and they quote, "Some people at the BRUDAC meeting agreed with them but they lost 13 to 6 at the BRUDAC meeting in January 2018."

THE COURT: Again, as you acknowledge, they disclosed that they did not meet the per day Cmax requirements. And any investor who is concerned about that clearly had available to him in the market information as to whether or not that was important or not.

MR. TYRE-KARP: Your Honor, I would like to get back to that issue because I think it's a serious issue. And Mr. Blair has avowed that he is not invoking a truth on the market defense and has cited several cases. And *Sanofi*, which is the case defendants primarily rely on, says in that case that defendants were not invoking a fraud -- a truth on the market defense because they are not arguing that the

35

market was aware of the omitted information prior to the misstatements.  On the very first page of the motion to dismiss in this case, the very first page, defendants argue the market was well aware of the allegedly omitted trial results and how they measured up against the FDAs pre-determined secondary endpoints.  The defendants also filed a request for judicial notice trying to attach several analyst reports the purpose of which they claim is to show what was in the public realm, i.e., that analysts in the market were aware that TLANDO had not met any of the FDAs pre-specified secondary endpoints.  These arguments are directly invoking the truth on the market defense.  The truth of the market defense is a fact intensive defense that defendants have the burden of proving to show that the omitted information had already gone to a market in an intensive direct way more so that outweighed --

THE COURT:  But you're missing my point.  My point is not that they had to go to the market, it was clearly disclosed in their own disclosures that they didn't meet the secondary endpoints.  That's the problem I have with your argument.

MR. TYRE-KARP:  So defendants do not disclose that that's what matters.  They mislead investors into believing that --

THE COURT:  Again, you qualify it by saying that

36

that's what matters.  That's a statement of an opinion as to whether it matters or doesn't matter.  But the question is it was disclosed.

MR. TYRE-KARP:  Your Honor --

THE COURT:  The investors decide whether or not it matters to them or not.

MR. TYRE-KARP:  Your Honor, it's a statement of fact that the FDA told Lipocine that all that mattered was the per day requirements.

THE COURT:  They never -- they never made that argument.

MR. TYRE-KARP:  Your Honor, if you -- respectfully, if you look at all of the briefing materials, the slide show presentations, the transcript of the BRUDAC Meeting, the FDA never once asked Lipocine what their per dose results were, they never give any indication that they care what the per dose results were.  Instead, they discuss only the per day results.  Those are the pre -- pre-determined secondary endpoints that the FDA used to evaluate each and every testosterone replacement drug including Jatenzo the day before the TLANDO meeting, and including TLANDO at the TLANDO meeting.  The secondary endpoints are determined by the per day Cmax analysis.

And while I -- plaintiffs don't dispute that Lipocine believed that the per dose requirement was the

37

proper analysis and should be used, the fact is that Lipocine knew that the FDA disagreed with that and they hid that fact from investors and they misled investors into believing that the FDA had given them some indication that that had changed.

And when investors were reading Lipocine disclosures during the class period, they knew that Lipocine had been in contact with the FDA and Dr. Patel discloses that during the class period that they had communications with the FDA.  So when Lipocine tells investors during the class period here's what matters it's the per dose not the per day, investors believe that the company is telling the truth, and they believe that the company had some information from the FDA indicating that the FDA has changed its mind, that it's not the per dose that matters, that it is not the per day that matters it is the per dose.  But as we investors learned the hard way when the CRL, the third CRL came out in November 2019, the FDA had never given that indication, had never changed its mind.  The only endpoints it cared about were the per day endpoints that it used for Jatenzo, which was also a twice daily oral testosterone replacement drug, that it used for every other drug, and that defendants had misled investors and the analysts who covered Lipocine about what the FDA cared about.

THE COURT:  So that's your whole case that they

should have disclosed that the FDA was using a per day Cmax requirement rather than a per dose?

MR. TYRE-KARP:  Yes.  And they shouldn't have told investors that they met one of the secondary endpoints and they should not have told investors that their other secondary endpoints were similar to other approved products when they just flatly were not.

THE COURT:  All right.  Move to scienter and show me how you believe that there is a strong inference that the company did not in good faith believe that it would be able to convince the FDA that the per dose requirements were adequate.

MR. TYRE-KARP:  Your Honor, respectfully I don't believe that the threshold is whether they would be able to convince the FDA of that or not.  It's that they did not disclose the facts to give investors the opportunity to properly weigh that risk.

THE COURT:  I'm talking about scienter.

MR. TYRE-KARP:  Yes, Your Honor.

THE COURT:  In order to plead this case, you have to show that they intended to deceive the marketplace.

MR. TYRE-KARP:  Yes, they intended to deceive or they were reckless in not knowing that they would deceive.

THE COURT:  And I don't -- I don't see an inference that I mean --

39

MR. TYRE-KARP:  So --

THE COURT:  Under the *Tellabs* and the other cases, I have to weigh the evidence to determine whether or not -- well, I mean I have to say I have to weigh the facts of it as alleged to determine whether or not the inference equally supports a good faith action by the defendants as opposed to a deceitful action by the defendants.  In that process, I don't see how you satisfy the requirement that the inference strongly infers that they acted with the intent to deceive.

MR. TYRE-KARP:  So, Your Honor, there are mis -- there are positive misstatements and there are omissions in this case.  And plaintiffs plead that the omitted facts were both known to the defendants and defendants admit that they knew all of the allegedly omitted facts and that they knew that the omission of those facts would mislead investors.  And defendants throughout the class period took every opportunity --

THE COURT:  Back up.  You said there is -- there is facts to support that they knew this would mislead investors.  What facts do you allege to support that?

MR. TYRE-KARP:  The fact that by focusing on the per dose analysis in their financial statements and in their investor presentations over and over was not a mistake, it wasn't unintentional, it was a deliberate decision to focus

40

only on the per dose instead of the per day.

THE COURT:  That doesn't overcome their assertion that they believed in good faith that they would be able to convince the FDA that the per dose Cmax was the appropriate standard to be applied.

MR. TYRE-KARP:  Your Honor, whether or not they believed they would be able to convince the FDA is different from whether they intentionally misled investors into understating the risk that they would not be approved.

THE COURT:  But you're twisting the analysis. The analysis is whether or not they in fact in good faith intended to believe that they could proceed and make the statements that they made.  Whether they're pleading in good faith is different than whether they intended to deceive. And it looks to me like based on the facts that you have alleged, the inference is equally strong that they believed in good faith that they could proceed as they had, as they did proceed, as opposed that they intended to deceive the market.

MR. TYRE-KARP:  Your Honor, if the inferences are equally as strong, then the complaint should be allowed to continue.

THE COURT:  Where is your authority for that? That's not what *Tellabs* says.  The PSLRA requires a strong inference of intent to deceive.

41

MR. TYRE-KARP:  Under *Tellabs* the inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.  So...

THE COURT:  I'm just saying to you, based on the facts that you have pled, I don't believe that it is.

MR. TYRE-KARP:  Okay, then.  Sorry, Your Honor, I had heard you say that you thought they were equally persuasive and I'm saying if there is a tie, the tie goes to the plaintiff if they're both equally persuasive.

THE COURT:  That's not how I -- that's not how I read *Tellabs.*  It says that the inference of dissent has to be cogent.

MR. TYRE-KARP:  And at least as compelling as the nonfraudulent inference.

THE COURT:  Yeah, at least as compelling is not equal.  Maybe I'm missing something, but it seems to me that you spend very little time in your brief and very little time in your complaint alleging facts that would support scienter.

MR. TYRE-KARP:  So we have discussed the omissions.

THE COURT:  Here's your opportunity to explain to the court why you believe that you have met the scienter requirements.

MR. TYRE-KARP:  All right.  So I would point to

two things.  First, the *Arena Pharmaceuticals* case in the Ninth Circuit has some similar facts to this case.  And that's 840 F3.d 698, the 2016 case in the Ninth Circuit. And it's relevant to -- Mr. Blair brought up the fact that Lipocine received tentative approval for TLANDO in December 2020 though final approval was still -- still had not been granted.

In *Arena,* there is a similar factual situation where the defendants and the company had not disclosed the FDA's concerns about one of the studies that a company was using in its application for its drug.  And although the drug was ultimately approved, the Ninth Circuit reversed the district court and found that there was scienter for the defendant's failure to adequately describe the FDAs issues and concerns with the study that defendants had presented.

And tellingly, the Ninth Circuit said that it's the failure to disclose issues and concerns and the FDA's interest in the outcome of those studies not that it is ultimately right about the underlying science that matters. So even though Lipocine may have been right about what the proper -- what the proper test was, even though they fully believed in their hearts that the per dose test was the ultimate test, the fact is that they did not disclose to investors, they misled investors, about what the FDA thought about that, and they knew what the FDA thought about that,

43

and they knew that they were misleading investors about it. They might have thought they were right, they might have thought they were going to win, they might have thought that they were going to get approval and the FDA would see it their way, but they had a duty to investors to disclose the whole truth once they -- once they spoke on the subject, and they intentionally did not do so.  They intentionally told one side of the story without disclosing the adverse facts. And the adverse facts being that the FDA did not agree with them.  That the FDA said we will use the per day analysis just like we used for Jatenzo, just like we used for TLANDO in 2018, and they didn't tell investors that, they failed to disclose that to investors and it's similar to the *Omnicare* analysis where they omitted facts, other opinion statements, that directly contradicted the statements they made and their failure to disclose those adverse facts misled the market.

THE COURT:  Is there some statement by the FDA that said we are rejecting the per dose analysis?

MR. TYRE-KARP:  The FDA at the 2018 meeting says that the per day analysis is what matters.  They do not discuss the per dose analysis, it's not even a consideration that they're going to discuss the per dose analysis.

THE COURT:  Well, then you expanded upon that. Did they say we're applying the per day analysis or did they

44

say we're rejecting the per dose analysis?

MR. TYRE-KARP:  Lipocine did not even propose to use the per dose analysis.  There was no opportunity to reject it.  It was not discussed, it wasn't even on the table.

THE COURT:  All right.  Anything further that you want to say about scienter?

MR. TYRE-KARP:  Yes, Your Honor.  It has been discussed that a company's desire to stay afloat is potentially applicable to every company.  But there are multiple cases, and they're cited in the briefing that it's not applicable to every company.  I would point to *Medina v Clovis Oncology,* District of Colorado, 2017, 215 F. Supp. 3d 1094 which are very similar facts to this case.  A pharmaceutical company run by its cofounder that had no approved drugs, no sales, no revenue, was entirely dependent on capital from investors to fund its operations. Misstatements -- alleged misstatements about the only drug that was near approval and plaintiffs allege that this was scienter, that this was a mode of allegation that attributed to scienter.  The defendant said no, this is a generalized argument that applies to every company.  And the court there rejected that, holding that the mode of allegation provided a compelling inference of scienter that was specific to *Clovis* because they had no sales revenue, they only had

45

three drugs under development, they were heavily dependent on investor capital, and the alleged misstatements were about its most important drug.  And each of those is true of the case here.  That all of the statements were about TLANDO, which the company is spending over 90 percent of its research and development costs on.  The company has never had any real revenue despite being around since the 90s. They were dependent on raising capital from investors.  To stay afloat they disclosed specifically to investors that they had -- if TLANDO was rejected again, they would need to raise money to continue their operations.  And they were desperate to raise money.  That's motivation, that's scienter.

THE COURT:  Is it true that the company's financial situation was fully disclosed to the investors?

MR. TYRE-KARP:  To the extent that I'm aware, yes.

THE COURT:  Okay.  Anything else?

MR. TYRE-KARP:  We don't have any discovery into the company's financial situation that is not from public disclosures because the PSLRA discovery is stayed.

THE COURT:  But there is nothing in the disclosures that concealed from the public the fact that this is their only product, that they were raising funds to develop this product, and that the company's future depended

46

upon successfully developing this TLANDO?

MR. TYRE-KARP:  No, Your Honor.  In fact, they disclosed all of that.  That's how we -- that's how we plead it.

THE COURT:  Other arguments you wish to make before I go back to the defendants?

MR. TYRE-KARP:  So in terms of scienter, defendants put forth in their request for judicial notice Form 4 filed by Dr. Patel showing that he acquired 10,000 shares of Lipocine during the class period which they first request that the court take judicial notice of; and second, they argue that it negates an inference of scienter because it shows that Mr. Patel was increasing his holdings and had purchased Lipocine shares during the class period.

And first, plaintiffs believe that it is inappropriate to notice the Form 4 for that purpose. Plaintiffs do not allege that Mr. Patel had any stock transactions during the class period that would have effected his scienter.  It's not part of the complaint. This is a new fact and a new argument being raised by defendants which is inappropriate for a request for digital notice.

And second, the Form 4 that they submitted and on the FCCs website, shows that the 10,000 shares were an award, that they were not a purchase they were an award.

47

And that's how they're coded on the FCC's EDGAR Website and awards are very different than purchases and in fact weigh the opposite way in terms of scienter. And it was 10,000 shares at about $1.50 per share, it's only about $15,000, which I think should not weigh much either way in the scienter analysis. But I wanted to address that since Mr. Blair believes that it's one of the key facts for scienter.

THE COURT: Would you also address the argument that is raised in the briefs, wasn't raised orally, as to whether or not you satisfied the requirement that the -- just a second I'll tell you the right -- that there is a causal connection between the misrepresentations and the artificial price of the stock. The lost -- the causal lost analysis.

MR. TYRE-KARP: Yes, Your Honor. To plead lost causation at the pleading stages doesn't require proof it just requires pleading. The *Dura,* the U.S. Supreme Court in *Dura* said it can amount to a shortened claimed statement of a causal connection. And here we allege that the misstatements were all related to the company's failure to disclose the true risk of the secondary Cmax endpoints being a serious impediment to approval of TLANDO. And when the FDA confirmed that they were rejecting TLANDO solely on the basis of its failure to meet the secondary Cmax endpoints,

48

that was both a corrected disclosure to the misstatements that defendants made during the class period and a materialization of the risk that the defendants had hid from investors.  And the fact that Lipocine stock dropped 70 percent upon that disclosure caused a tremendous loss to investors and they were damaged thereby.

THE COURT:  Okay.  Anything further you wish to argue?

MR. TYRE-KARP:  No, Your Honor.

THE COURT:  Let's go back to defense counsel.  Do you wish to respond?

MR. BLAIR:  Yes, Your Honor, very briefly, and thank you for the opportunity.

I want to address loss causation in a minute, but I want to correct something that Mr. Karp said that is flatly wrong.  And that is that the FDA told Lipocine that it was the per day dosing that matters.  That is not in the complaint, that is not in the record, that has never been said from the FDA to Lipocine.

Now, I want to be clear what was talked about at the Advisory Committee Meeting, and this is Docket Number 48-4 at Page 18.  Now this is one of the advisory committee members talking about TLANDO's unique formulation and why there might be an issue as to whether or not the secondary endpoints should or should not apply to TLANDO.

49

This is Dr. Joffe says quote, "If this was a topical testosterone and came with those Cmax values, we would reject the application and say it shouldn't be approved. But those have different pharmacokinetic profiles than what you're seeing here."

"This is actually a very novel area for the FDA, and that's one of the areas where we seek your input as well in terms of how to handle these Cmax outliers for this product."

Now moving forward, when the company received the CRL in May of 2018, this is the only thing the FDA told Lipocine with respect to the Cmax excursions. It asked -- it asked the company to, quote, "Provide justification for non-applicability of the agreed upon and pre-specified Cmax secondary endpoints for TLANDO." That's Paragraph 54. Now that is not a statement by the FDA saying only the per day dose matters and we're rejecting the per dose analysis. The FDA is not saying that. It's saying Lipocine, based on your belief, explain to me why these pre-specified thresholds aren't applicable to TLANDO because of these isolated and transient increases versus the sustained ones with the other TRTs. And that's critically important.

Now subsequent to the receipt of this CRL, there are no communications alleged from the FDA saying it's per day what matters, it's per dose what matters. What they

50

wanted was sufficient justification for why those endpoints, irrespective of the analysis, were not applicable to TLANDO given the non-increase of adverse effects. And that's what the company did.

Now ultimately, the company -- the FDA in November of 2019 said it needed additional information on this Cmax issue. That's what Lipocine provided. It's now been received tentative approval. But their case falls apart when plaintiffs, as they must, concede that the FDA never told them that the per day analysis was what mattered. And one other point to that he commented that Jatenzo met the secondary endpoint and that's why it received secondary approval. That's also false.

At Paragraph 64 of the complaint it lists a chart including Jatenzo's Cmax results and it talks about the lowest threshold, the 1,500 threshold Jatenzo didn't meet that endpoint. It was 82.8 percent not 85 percent. And then with respect to the highest Cmax thresholds, plaintiffs again concede in footnote seven of their complaint that three -- three subjects exceeded the 2,500 threshold, Cmax threshold for Jatenzo.

So to say that Jatenzo met it and it is therefore -- therefore Lipocine was incorrect in saying that it was generally applicable to these other oral and injectable products, is just wrong. Now with respect to motive,

51

Mr. Karp mentioned the *Clovis* case. And I'm glad he did because even if the court takes a cursory glance at that case, it is so diametrically opposed to the facts of this case that it renders the case a nullity.

First, Clovis doesn't involve an increase in holdings by the individual defendants. There are no allegations of that in the *Clovis* case. But second, the court in *Clovis* held that the mode of allegations weren't just premised on *Clovis's* financial dependency, but, and this is a quote, "The underlying facts of the drug related to motive."

Now I briefly want to touch on why the court allowed the case in *Clovis* to proceed. In that case, it involved a lung cancer drug with the endpoint being called objective response rate. And essentially it was whether the tumor shrunk. Now, there were the trial protocol and the FDA guidance required *Clovis* to conduct their study in such a way to be able to confirm that result and disclose it to the public. What *Clovis* did, however, was violate the trial protocol, violate FDA guidelines and reporting unconfirmed responses whereas the trial protocol and FDA guidance required, quote, "confirmed responses."

Now that's no where in this case. And not to mention in that case the data was hidden. The actual confirmed results were not disclosed to investors. Here

everything was disclosed.  The per dose results, the per day results, and so there was nothing that was hidden.

And then lastly with respect to loss causation, Your Honor, the plaintiffs alleged that the truth emerged on November 11, 2019, when the company announced that it had received -- that the FDA had again rejected the NDA for TLANDO because the DV study did not meet the secondary endpoint.  That's at Paragraph 94.  But other than the issuance of the CRL itself, in which defendants are not alleged to have had any advanced notice, again, nothing in the class period from the FDA.  This disclosure neither revealed any new information nor revealed any concealed risk.

Again, since June 2017 the company disclosed the DV study did not meet the secondary endpoints.  That was public knowledge.  And Lipocine never guaranteed FDA approval.  If you look at Paragraph 75 or anywhere where the company talks about TLANDO, it talks about we can make no assurances that the FDA will approve the drug based on our analyses and based on our additional studies.

So put simply, the only -- this drug drop was the result of bad news.  The FDA's issuance of a CRL.  It wasn't the revelation of a concealed risk or fraud and the *Williams* case, this is 558 F3.d at 1137 makes clear that the securities laws are not meant to provide investors with

53

broad insurance against market losses in a risky endeavor like a drug development company.  That's exactly what they're trying to do here, Your Honor.

MR. TYRE-KARP:  Your Honor, if I may respond to a couple of those points.

THE COURT:  Sure, go ahead.

MR. TYRE-KARP:  All right.  First of all Your Honor asked did the FDA ever tell Lipocine that what mattered was the per day testing requirement?  And Mr. Blair just helpfully quoted from the CRL that Lipocine received in May 2018 which referred to the agreed upon and pre-specified Cmax secondary endpoints.  And the agreed upon and pre-specified Cmax secondary endpoints were the per day requirements.  That's what the FDA cared about, that's why they rejected the second NDA, that's why they rejected the third NDA.  Both of those were listed in the CRLs.  They said you did not meet the pre-specified agreed upon endpoints which are the per day requirements.

And Mr. Blair talked about Jatenzo didn't pass all three secondary endpoints either.  But Jatenzo was judged based on the per day analysis despite being a twice a day oral treatment, just like Lipocine's TLANDO, they were judged on the same per day analysis as all of the other drugs.  And while they had three people who were over the 2,500 limit when they were supposed to have zero, the FDA

determined that those tests had been contaminated and they accepted Jatenzo's explanation for those three tests which was in direct contrast to the one person in the TLANDO study who was over 2,500 where the FDA did not accept TLANDO's explanation -- Lipocine's explanation.  They said it's not clear that the gallbladder removal from that patient had attributed to the Cmax excursion over the maximum allowed limit.

And I also -- Mr. Blair quoted one of the members of the BRUDAC committee that was seeming to agree with Lipocine in 2018.  I think it's important to note that that committee member was outvoted 13 to 6 and the BRUDAC Committee voted not to approve Lipocine.  And one of the four reasons they gave for not approving it was that it failed to meet the pre-specified, pre-approved agreed upon Cmax limits.  And they said that Lipocine could convince them that those aren't the ones that should apply, but those were the agreed upon ones and they never agreed that they didn't apply.  They asked Lipocine -- they gave Lipocine an opportunity to convince them they didn't apply, and Lipocine went ahead and told investors essentially that they don't apply and went ahead and told investors that the per dose analysis is what applies.

THE COURT:  It seems to me that you're significantly overstating your case when you say they told

55

investors that it didn't apply.  There is nothing in the disclosures that says anything like that.

MR. TYRE-KARP:  When they told investors that they met the -- that their secondary endpoints were similar to approved drugs, that was based on the per dose analysis not the per day analysis.

THE COURT:  But they disclosed the fact that they didn't meet the per day -- per day Cmax requirements.  That was all disclosed.

MR. TYRE-KARP:  Yes, Your Honor, the fact that they did not meet the per dose -- they don't meet the per day Cmax requirements was disclosed.  The fact that that is what the FDA cared about was not disclosed.

THE COURT:  Yes.

MR. TYRE-KARP:  Never once during the class period was that disclosed.

THE COURT:  All right.  Anything further before we conclude?

MR. TYRE-KARP:  That's it, Your Honor.

THE COURT:  Mr. Blair, anything further from you before we close?

MR. BLAIR:  No, Your Honor.  Thank you very much for your time.

THE COURT:  Thank you for your briefing and your arguments.  I'll take this matter under submission and rule

56

as soon as we can get to this matter.  We will close the hearing.  Thanks.

                    MR. BLAIR:  Thank you, Your Honor.

                    MR. TYRE-KARP:  Thank you, Your Honor.

                    MR. MARSDEN:  Thank you, Your Honor.

                    (Whereupon, the hearing concluded at 11:25 a.m.)

**REPORTER'S CERTIFICATE**


I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

In witness whereof I have subscribed my name this 31st day of August, 2022.


                    *Laura W. Robinson*_____

                    Laura W. Robinson

                    RPR, FCRR, CSR, CP